**NATIONAL AMERICAN CORPORATION,**
Plaintiff,

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.**

**No. 76 Civ. 2745 (GLG).**

United States District Court,
S. D. New York.

March 27, 1978.

Eaton, Van Winkle, Greenspoon & Grutman, New York City, for plaintiff, by Norman Roy Grutman, Jeffrey H. Daichman, Richard A. Rubin, New York City, of counsel.

Kissam, Halpin & Genovese, New York City, for defendants, by Leo T. Kissam, James G. Simms, Dennis J. Crossley, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

### Introduction

In the spring of 1975, for reasons which never clearly emerged despite a trial lasting three weeks, defendant, Federal Republic of Nigeria ("Nigeria"), acting through its Permanent Ministry of Defense, mounted a massive cement purchase program. The quantity ordered in sixty-eight contracts from various internationally placed suppliers aggregated over twenty million metric tons. One suggested motive was that, in previous years, Nigeria's experience had been that only ten percent of cement ordered was delivered. There were also suggestions that Nigeria had knowingly embarked on what would become a most ill-fated endeavor to corner the world's cement supply. Whatever Nigeria's original purpose, it cannot be disputed that the astronomical quantities ordered far outstripped the unloading capacity of Nigeria's deep water ports, principally Lagos Apapa.

For their part, the cement suppliers, allegedly spurred by visions of huge demur-

rage [1] claims when the inevitable port congestion delayed unloading, sought to charter small tonnage vessels. (In addition, defendants contended that several suppliers would make partial shipments aboard the same vessel, with each submitting claims for the full demurrage determined at a fixed rate *per diem.*)

The confusion in the port of Lagos climaxed in the early fall of 1975, and there was some suggestion that the presence of hundreds of cement-carrying vessels began to seriously threaten the supply of vital consumer goods. In response, Nigeria placed an embargo on the port, refusing additional vessels permission to enter. As the influx of cement vessels ground to a halt, plaintiff, National American Corporation ("NAC"),[2] was one of many nominal suppliers caught up in a situation over which it had lost control. (As will appear subsequently, there are suggestions that NAC, an American company, was a mere front for certain Spanish interests, designed to satisfy Nigeria's desire to do business with solvent American companies.)

## I. *Facts*

On April 3, 1975, Nigeria entered into a contract with NAC for the purchase of 240,000 tons of Portland cement at $60 per metric ton C.I.F. Lagos, for a total purchase price of $14,400,000. The contract provided for demurrage at a rate "not exceeding $ U.S. 3,500.00 per diem." Nigeria promised to issue, through its state bank, defendant, Central Bank of Nigeria ("CBN"), an irrevocable letter of credit. The contract further states that it is to be governed by the laws of "New York City."

On May 9, 1975, CBN informed its correspondent bank, Morgan Guaranty Trust Company of New York ("Morgan"), of the establishment of its irrevocable, transferable letter of credit in favor of NAC in the amount of $14,400,000. (Since this amount represented only the total purchase price of cement without regard to potential demurrage claims, subsequent correspondence between the banks was necessary to clarify that demurrage payments would be made beyond the face amount of the letter of credit.) Following CBN's instructions, Morgan advised NAC of the issuance of the letter of credit through NAC's bank, a branch of the Bank of America located in New York City, without adding its own confirmation. The credit, which repeated verbatim the material terms of the cement contract, ran until May 31, 1976 and was made subject to the Uniform Customs and Practice Documentary Credits (1962 Revision) Chamber of Commerce Brochure No. 222.[3]

On July 31, 1975, NAC, acting through its president and major shareholder, Dr. Ilona Gero, transferred $970,000 of the letter of credit (representing payment for 20,000 tons of cement at $48.50 per ton) using forms supplied by Morgan to a Spanish corporation, International Trade and Finance Espanola, S.A., ("Intrafinsa").[4] Its

1. Demurrage is a penalty imposed upon a consignee when a vessel is delayed in discharging its cargo. *Hellenic Lines, Ltd. v. Director General of India Supply Mission*, 319 F.Supp. 821 (S.D.N.Y.1970), *aff'd*, 452 F.2d 810 (2d Cir. 1971). The cement contract provided that demurrage would commence upon the expiration of a number of lay days determined by the tonnage of cement carried.

2. Plaintiff is a Delaware corporation having its principal place of business in the city of New York. Jurisdiction is founded upon diversity of citizenship. 28 U.S.C. § 1332(a) (1970).

3. While the contract called for a confirmed letter of credit, NAC did not object to Morgan's merely adding its advice. Payment was to be made for cement "C.I.F.", upon presentation of

the following documents: a commercial invoice, "All Risks" insurance certificate, and a clean on-board bill of lading. In this manner, the cement supplier's right to payment accrued at loading, rather than upon delivery of the goods.

The contract also provided for arbitration of all disputes before the International Chamber of Commerce in Paris, France, but none of the parties has invoked this procedure, which appears proper in light of the subsequent Agreements of Discharge which are discussed in the text at 630, 631.

4. A contract executed the same day between Arrau and Gero refers to the "Contract of Bismarck Corporation" and relates to NAC's purchase of 120,000 tons from Intrafinsa, rather than the 20,000 tons covered by the transfer of

principal officer and major shareholder, Augustin Arrau, plays a vital, if somewhat obscure role in the events which followed. This transfer was later increased by $10,670,000 on August 8, 1975, for a total of $11,640,000, representing the cost of NAC's entire cement commitment to Nigeria, including insurance and freight. This left an interest remaining to NAC in the letter of credit for cement of $2,760,000. (Part of this was also assigned to another Arrau company.) On the same day as the first transfer to it, Intrafinsa assigned all of its interest in the credit to its sister corporation, National Bank and Trust Co. of North America, Ltd. ("Natbank").[5] After the problems giving rise to this action developed, NAC reacquired sole rights in the letter of credit by reassignment from Natbank on April 9, 1976 allegedly in return for NAC's relinquishing its rights to various commissions owed under other similar contracts given to other American suppliers. The reassignment was preceded by negotiations, beginning in January and February of 1976, in which NAC agreed to pay shipowners' claims for demurrage when recovery was obtained by NAC.

During February, 1976 (prior to the reassignment) Intrafinsa assigned the demurrage already due on one of the vessels, the Cherryfield, to Ince & Co. in London. Morgan and CBN were notified that Cherryfield's demurrage payments should be made directly to the assignees.

Performance of the cement contract got underway in late July, 1975, with the shipment of 500 tons of cement aboard the vessel Cretan Life, which also carried 10,500 tons consigned by another cement supplier, Interexporte. Thereafter, in the late summer and early fall of 1975, five additional vessels, the Naimbana, Rio Doro, Cherryfield, Joboy and Jotina (who, with the Cretan Life are collectively referred to as the "first six vessels") were loaded and arrived in Lagos. Payment for their combined cargoes of 37,630 tons was completed by September 10, 1975 by Morgan on the basis of documents presented to it, although the vessels had not yet been unloaded. NAC received a total of $233,300, an amount reflecting offsets by Morgan for the transfer to Intrafinsa and several assignments of proceeds.[6] Six other ships, the Aristotle, Astrid, Ardenal, Sandrina, Euna and Nicklaus H ("the second six vessels") were either prepared for loading or partially loaded before their departure had to be aborted due to the Nigerian embargo. Their cargoes were purportedly sold elsewhere, but both NAC and Intrafinsa claim they did not benefit from these sales. On the other hand, they established no losses either, except, perhaps, for anticipated profits. With regard to the first six vessels, documents supporting demurrage claims were presented to Morgan in November, 1975 but payment at that time was refused on the in-

the letter of credit. No adequate connection was made at trial between this contract and the July 31, 1975 transfer of the letter of credit. The contract may have involved other transactions between NAC and Intrafinsa unrelated to those involved in this suit.

5. Arrau was the principal officer ("managing director," as he phrased it,) of both Intrafinsa and Natbank. The latter was a banking corporation organized under the laws of the British West Indies and purportedly formed to avoid Spanish currency restrictions. Natbank owned 49% of the shares of Intrafinsa, both were under common control and are now in the hands of creditors. Arrau, apparently, did not always treat the two corporations as separate legal entities. In the cement transaction, Natbank chartered the vessels, while Intrafinsa's bank guaranteed payment of demurrage to the shipowners.

6. In the summer of 1975, NAC executed three assignments of proceeds for cement payments due it under the letter of credit to Daniel F. Young, Inc. on June 26, 1975 for $120,000; to Natbank on August 7, 1975 for $576,000; and to Bismarck Corporation on August 7, 1975 for $456,000. Morgan was not notified of the cancellation of these assignments in March, 1976.

Each assignment was for a certain amount of money per ton of cement, with payments to be made periodically as money was received from Nigeria. Plaintiff testified that after the last payment for cement was made in March, 1976, under the Agreements of Discharge, the assignments were cancelled since the Agreements of Discharge ended Nigeria's duty to perform the remainder of the contract.

structions of CBN for reasons we will now discuss.

To backtrack a bit, by late August, 1975, the port congestion led Nigeria to notify its suppliers that no additional vessels would be permitted to enter the port, except those already under sail. (The "embargo" referred to earlier.) To enforce its new policy, Nigeria declared that henceforth all suppliers must give two months' advance notice of sailing and receive Nigerian permission for departure. In a series of cables in fall of 1975, CBN instructed Morgan to dishonor all demurrage claims, even those accruing on vessels entering prior to the embargo, unless CBN had certified the documents for payment. Documents were thereafter to be submitted directly to the Nigerian Ports Authority, rather than Morgan. (Since these instructions varied the terms of the irrevocable letter of credit, they may have amounted to an anticipatory repudiation of all, or a part, of the letter of credit.) Nigeria later formalized its policy of requiring advance notice of sailing in a government decree issued December 15, 1975.

As of this time, Nigeria was refusing to pay demurrage as it accrued and was unable to unload many of the vessels which lay at anchor in the harbor. Of NAC's first six vessels, the Naimbana was unloaded in November of 1975, and the Joboy and Jotina offered to forego accrued demurrage if they would be given priority berthing. This request was refused, and the vessels departed from Nigeria on January 24 and 25, 1976, respectively, without discharging their cargoes.[7] In the early part of that month, Gero had received an invitation to meet with the newly formed Nigerian Cement Contracts Negotiating Committee to

renegotiate the cement contract and the letter of credit. About three weeks later, Gero and Arrau met in New York to plan a course of action. The result was a document dated January 28, 1976 which apparently was intended to become a settlement between NAC and Intrafinsa supplanting the agreement of July 31, 1975. (Plaintiff's Exhibit 38.) The document sets Intrafinsa's damages at $3,945,000, which was said to represent the demurrage due on *twelve* vessels, calculated at $3,500 per day. NAC also promised to "cause" Nigeria to accept delivery of an additional 28,370 tons of cement. Calculations supporting the demurrage claim appear as a schedule to the document.[8]

At trial, copies of two schedules having a similar format (Plaintiff's Exhibits 38B and 71) were introduced into evidence. Both bear a striking resemblance to the schedule attached to Exhibit 38, with some significant changes. The first noteworthy change is that Exhibit 38B calculates demurrage at a *pro rata* rate based on tonnage. To explain, the rate of demurrage had become a source of irritation between Nigeria and the suppliers. The contracts appeared to provide for a flat rate of $3500 *per diem,* without regard to the size of the vessel or the amount of cement on board. Nigeria wished to compute demurrage on a *pro rata* rate based on tonnage by paying $.35 per ton per day. This would amount to a substantial savings if the vessel capacity or cargo amount was less than 10,000 tons. The *pro rata* calculation yielded an amount of demurrage due of $2,784,140.

Exhibit 38B also reflects a claim for the cement aboard the second six vessels of $1,992,000 representing payment for 33,200

---

7. It must be remembered that Nigeria had paid $786,000 for the cement aboard these vessels the previous August or September. After withdrawing their vessels, the shipowners exercised liens on the cargoes, to satisfy their demurrage claims.

8. The exhibit does not reflect the amounts never paid for the cargoes of the second six vessels as an item of Intrafinsa's damages. Apparently Exhibit 38 originally had an "exhibit A" attached reflecting a cement claim.

With the exception of the calculations for the Cretan Life and the Naimbana, demurrage appears to be claimed through January 21 or 22, which is consistent with the date the schedule bears. It is puzzling, though, that the schedule lists "ETA" dates for vessels which had long since actually arrived. The Court notes that "ETA" is a common abbreviation for "estimated time of arrival," while "TA" stands for "time of arrival."

tons. The exhibit also changed a column heading to "Vessels Awaiting Delivery of Which Cargo and Demurrage Still Unpaid." [9] Finally, a column of dates designated on Exhibit 38 as "ETA Lagos" reappears on Exhibit 71 under a pencilled notation "TA Lagos," an implication that these vessels had actually arrived. In this manner, the stage appears to have been set for a request for payment for demurrage on the second six vessels. [10]

The puzzle created by these schedules stems from their Alice In Wonderland character. It is impossible to calculate demurrage—which under this contract commenced at some point after the vessel arrived in Lagos—on vessels which never sailed. The key appears to lie in the fact that demurrage calculated on a pro rata rate ($.35 per ton per day) for twelve vessels if added to the amount "due" for the second six cargoes roughly approximates the demurrage due on six vessels calculated at the flat *per diem* rate ($3500 per day). Gero maintains that in January, 1976, she believed twelve vessels in fact had arrived in Lagos and did not learn the truth until after this suit was commenced. It appears doubtful that Gero, who was unquestionably aware of the embargo, remained ignorant of its effect on her ships when, in the fall of 1975, the sailing of the second six vessels had to be aborted and other arrangements made for disposition of their cargoes. This state of affairs could only have existed if, as suggested earlier, she was only a front for Arrau. It is not disputed that Arrau knew the true state of affairs.

At their meeting in New York, Gero and Arrau called in Doris Delia, another holder of a Nigerian cement contract. On her representation that she had influence with the Nigerians, they engaged her as their agent in the upcoming negotiations with the Cement Committee. Arrau executed a written power of attorney, which Gero did not sign, authorizing Delia to negotiate terms closely paralleling the claims incorporated in Exhibit 38. (Both denied giving Delia a copy of either Exhibit 38B or 71.)

Immediately thereafter, Delia went to Nigeria, returning to London the first week of February to meet with Gero and Arrau. At that time, they executed two almost identical form agreements entitled "Agreements of Discharge", one with the Federal Ministry of Defense on the cement contract and one with CBN on the letter of credit. The material terms of these terse documents, which state that they were executed as of February 6, 1976, may be summarized as follows:

1. payment would be made within thirty days of execution for 70,830 tons of cement, represented as having "either been delivered . . . or at present awaiting delivery in vessels lying within Nigerian territorial waters; "

2. payment would be made within fourteen days of presentation of the requisite documentation to the Nigerian Ports Authority for demurrage, with payment to continue thereafter until final discharge of the vessels;

3. the parties acknowledged that further deliveries of cement had been rendered impossible by the port congestion;

4. NAC and Intrafinsa released CBN and the Ministry of Defense from all liability on the remaining 169,170 tons of cement and indemnified the Nigerian entities for all third party claims.

Delia then returned with the signed agreements to Nigeria where they were executed by the Nigerians later in the month. It appeared at trial that the Cement Committee had no ready means at hand for verifying claims submitted to them by suppliers. Responsibility for implementation of the settlement and verifi-

---

9. Exhibits 38B and 71 appear to be carbon copies of each other, with Exhibit 71 having several telling handwritten changes.

Exhibit 38 had characterized the second six vessels as "Vessels Not Accepted" by Nigeria.

10. Exhibit 38B reflected demurrage beginning on the same day the bill of lading issued, which could be premised upon a theory of the demurrage claim beginning while the vessels were still in the port of departure, but prevented from sailing by Nigeria's actions.

cation of the claims rested with the Federal Ministries of Defense and Transport.

The 70,830 ton figure derives from the cargoes purportedly aboard plaintiff's twelve vessels, as reflected on the previously discussed Exhibits 38B and 71. To reiterate, of the first six vessels only one had been unloaded and only three remained in Lagos by this time; the last six had never sailed. (The cement aboard the first six vessels had been fully paid for the previous September.) Gero testified that when she and Arrau signed the agreement, this tonnage figure had not been filled in, although the provisos stating the payment terms for cement and demurrage, which were not part of the form agreements used by the Cement Committee, were part of the Agreements of Discharge when she first saw them in London. Had the inclusion of this tonnage figure been the only link with the misleading schedules, it would be more difficult to conclude that false demurrage claims were submitted to the Nigerians by Delia with the cooperation of either Arrau or Gero. However, there also exists a certification of the settlement agreements prepared by the Cement Committee, dated February 17, 1976, which Gero claims Delia delivered to her along with the executed Agreements of Discharge in mid-March. This document confirms that a settlement has been reached, states that NAC would be invited to supply cement if imports were resumed, notes that demurrage clauses will be given *pro rata* construction [11] (*i. e.,* with reference to tonnage) and incorporates the list of twelve vessels, their cargo amounts and, as to the second six vessels, the fictional dates of arrival, as they appear on Exhibit 71. Thus, the inference is almost inescapable, and is supported by the testimony of a member of the Cement Committee, that Delia presented Exhibit 71 to the Nigerians in support of the NAC–Intrafinsa claim.

It was not long before snags in the performance of the Agreements of Discharge developed. Although the agreements contemplated payment for cement by March 8, 1976, Morgan did not make payment until March 12. At that time, $1,992,000, representing payment for the cargoes of the second six vessels (33,200 tons) at $60 per ton, was distributed by Morgan in accordance with the still outstanding transfer to Intrafinsa and assignments of proceeds. This meant that the Nigerians had paid a total of $4,249,800 for twelve shiploads of cement, but would ultimately receive only four cargoes. Thus, a total of $2,778,000 was paid for cement never received.

Twelve sets of documents, each corresponding to one vessel, were presented to the Nigerian Ports Authority [12] in support of demurrage claims. The accompanying drafts sought payment at the *pro rata* rate [13] through February 7, 1976. Docu-

---

**11.** Defendants have contended throughout this litigation that the demurrage clauses in the original cement contract and letter of credit, as well as in the Agreements of Discharge, call for this *pro rata* method of calculation. These clauses themselves lend support to a flat *per diem* construction, although the certification of the settlement sent to plaintiff explicitly adopts the *pro rata* method. Arrau admitted, however, that he became aware in October that Nigeria wished to construe the original terms in this manner as the appearance of *pro rata* calculations on Exhibits 38B and 71 indicates. Defendants claim the alteration was necessary to correct the abuse, mentioned above, of several suppliers shipping cement aboard a single vessel, with each submitting a full demurrage claim, and of small vessels obtaining demurrage at a rate far in excess of the daily charter.

**12.** Defendants claim the documents were submitted in March, while Gero testified they were submitted in February and that she did not realize they were misleading until the summer of 1976, when she first learned that the second six ships never sailed. If believed, this evidence would dispel the suggestion that plaintiff either participated in or stood silently by while fraudulent demurrage claims were submitted to Nigeria. It matters little which version is believed, because the greater part of plaintiff's interest in the letter of credit derives from the reassignment by Natbank/Intrafinsa whose principal, Arrau, caused the documents to be prepared and was well aware that the vessels had never sailed.

**13.** The documents calculate demurrage at $.35 per ton per day without regard to the $3500 ceiling per day which defendants maintain was imposed by the demurrage clauses of the original contract and unaffected by the Discharge Agreements.

ments submitted on the first six vessels included time sheets[14] detailing days on demurrage for several weeks in November and bear the stamp of the ship's master. No detailed time sheets were submitted for the period spanning the end of November to February 7, 1976, although such documentation was required under the original letter of credit and cement contract. The documents for the second six vessels were even less complete in that no detailed time sheets were attached and they lacked the stamp of the ship's master and the date of the acceptance of the notice of readiness. (Which is understandable, since they never got to Nigeria.) Instead, they were certified as correct by Intrafinsa and by Natbank, the latter being designated as "disponent owner."

The Nigerians appear to have processed the documents for payment, disallowing some amounts on the basis of their calculations, but authorizing payment of $2,337,713 by late March. Throughout March and April, NAC sent cables to Morgan and CBN pressing for payment of demurrage on its twelve ships. Then, in April, the Nigerians became aware that some of the vessels covered by various settlement agreements that had not unloaded were not then in Nigerian waters. A census of the vessels in the port confirmed their suspicions and by May, NAC was listed as one of eleven suppliers whose ships could not be fully accounted for. An earlier memorandum of the Nigerian Ministry of Transport to CBN had suggested suspending all demurrage payments to suppliers who had received payment for undelivered cement, and this course was adopted with regard to NAC.

NAC did not respond to a cable demanding an explanation for the missing ships. Instead, the complaint in this action was filed on June 22, 1976 and an order of attachment issued the next day. By letter dated July 9, 1976, defendants indicated through their attorneys that they had "appeared specially" to oppose the attachment and an answer was ultimately filed after Judge Weinfeld of this Court granted plaintiff's motion to prove the grounds of the attachment in a written decision reported at 420 F.Supp. 954 (S.D.N.Y.1976). After the denial of motions for summary judgment (defendants having delayed until the eve of trial), the trial of this action commenced on December 19, 1977 and concluded on January 4, 1978.

## II. *Law*

■ The legal issues fall into four major categories:

A. Defendants' contention that plaintiff allowed its *quasi-in-rem* basis for jurisdiction to slip away, which collaterally raises the issue of whether a basis for *in personam* jurisdiction existed;[15]

B. The defense of sovereign immunity and the applicability of the act of state doctrine;

C. Defendant's claim that Intrafinsa is an indispensable party under Fed.R.Civ.P. 19(b);

D. Plaintiff's challenges to the Agreements of Discharge as a defense to its claims.

### A. JURISDICTION

#### 1. *Quasi In Rem*

■ Defendants assert that plaintiff failed to "perfect" its two attachments lev-

---

14. The time sheets cover in detail only the last two weeks of November. Time sheets covering the period from arrival to mid-November were submitted to Morgan in November when payment was refused and the documents returned. For some reason, these documents were not retrieved and resubmitted to the Nigerian Ports Authority.

15. Much of the trial was devoted to jurisdictional issues. Although never raised by defendants in either a motion to dismiss under Fed.R.Civ.P. 12(b) or in their answer, the pre-

trial order provided that the pleadings would be deemed amended to include issues raised therein.

As part of their jurisdictional defense, defendants have raised issues relating to the sufficiency of and non-receipt of process, although these grounds were not explicitly preserved in the pre-trial order. Issues of this type obviously should have been litigated when defendants first entered their "special appearance" and will not be considered now.

ied against funds at Morgan held in the name of CBN and of treasury bills at the Federal Reserve Bank of New York ("Federal Reserve") held in the name of Nigeria. Determination of this claim necessitates an evaluation of the facts surrounding the levies in light of New York's procedures for provisional remedies.[16]

Plaintiff was granted an order of attachment of defendants' assets on June 23, 1976 in the amount of $14,876,350, plus interest and costs. On July 1, 1976, a federal marshal levied against all funds of the defendants held by Morgan under the letter of credit at issue in this case, as well as "all other assets." On August 18, 1976, Morgan responded with a "garnishee's statement"[17] indicating that it held no funds of the Federal Republic of Nigeria, but that an account in the name of CBN showed a balance of $4,184,534.76. The account was subject to two prior orders of attachment, one issued by a New York state court and the other by a judge of this court. Testimony adduced at trial indicated that since the levy Morgan has maintained the funds in a segregated account and would not release them except on the instructions of the United States Marshal or an order of this Court. The amount presently held under the order of attachment is $16,134,892.43.

On September 15, 1976, the marshal levied upon defendants' assets at the Federal Reserve. Two days later, it responded with a garnishee's statement saying that it had "placed a hold on United States Treasury Bills totalling $15 million in face amount in the securities custody account on our books designated 'Federal Government of Nigeria'." These treasury bills were maintained as credit entries on the account books and were never evidenced by physical securities, although they could have been converted into physical securities. By letter of October 18, 1976, the federal marshal sought a turnover to him of the "monies" held pursuant to the order of attachment. Defendant's attorney opposed this course and the matter was allowed to lapse. Evidence at trial showed that, like Morgan, the Federal Reserve continues to hold these funds frozen in a segregated account and will not release them except on the marshal's instructions or a court order.

The accounts were never physically turned over to the marshal, nor was a turnover proceeding ever commenced. Plaintiff did, however, move for an extension of time to commence the proceeding on December 20, 1977, after the trial had begun. The significance of these lapses will be made clearer by the discussion of New York's attachment procedures which follows.

Section 6214 of New York's Civil Practice Law and Rules outlines the procedures for attachment levy "by service"[18] of an order of attachment. The first step in levying upon an account such as those in issue here is service of the order of attachment upon the garnishee. The levy effected in this manner does not require the sheriff to take custody of the account. Instead, the garnishee must hold the property for a period of ninety days commencing with the service of the attachment order. The levy must be perfected in one of three ways: physical delivery of the account to the marshal; commencement by plaintiff of a special proceeding[19] under N.Y.C.P.L.R. § 6214(d) against the garnishee to compel

---

**16.** State provisional remedies, such as attachments to secure *quasi-in-rem* jurisdiction, are available in federal courts by virtue of Fed.R. Civ.P. 64.

**17.** The statement was apparently submitted pursuant to Section 6219 which requires a garnishee to serve within ten days of service upon it of an order of attachment a statement indicating the debts of the garnishee owed to the defendant.

**18.** N.Y.C.P.L.R. § 6215 provides an alternate procedure for levy "by seizure" which requires

the sheriff to take into his custody property "capable of delivery" if the plaintiff indemnifies him.

**19.** A special proceeding is a New York procedural device which is distinguished from the standard civil action. N.Y.C.P.L.R. § 103(b) (McKinney 1972). The procedures used are similar to motion practice and the device is designed for speedy resolution of issues. Wachtell, New York Practice Under the CPLR 459 (5th ed. 1976).

turnover of the account to the marshal; or application for an order under N.Y.C.P.L.R. § 6214(e) extending the time in which to commence the turnover proceeding. 7A Weinstein, Korn & Miller, New York Civil Practice ¶ 6214.14 (1977) [hereinafter cited as Weinstein]. Failure to take one of these three steps results in the voiding of the levy after ninety days have elapsed. N.Y.C.P. L.R. § 6214(e). Where, as here, the levy was effected for the purpose of providing a *quasi-in-rem* jurisdictional basis, voiding the levy results in loss of the jurisdictional base. *Fishman v. Sanders*, 18 A.D.2d 689, 235 N.Y.S.2d 861 (2d Dep't 1962). Voiding the levy, however, does not affect the viability of the order of attachment and subsequent levies may be made under it, if the procedures of Section 6214 are followed. *Freedom Discount Corp. v. Clune*, 32 A.D.2d 833, 302 N.Y.S.2d 465 (2d Dep't 1969).

■ New York courts have occasionally recognized an exception to the statutory procedures if, under common law standards, the garnishee "attorns." Under this theory, the marshal will be viewed as having constructive possession where the garnishee unequivocally relinquishes control and explicitly acknowledges the right of the marshal to possession. *Fantasy Records, Inc. v. Traveler's Indemnity Co.*, 54 Misc.2d 799, 283 N.Y.S.2d 473 (Civ.Ct., N.Y.Cty.1967); *Sheridan Farms, Inc. v. Federico*, 48 Misc.2d 599, 265 N.Y.S.2d 922 (App.Term 1st Dep't, 1965); *see Dumpson v. Manufacturer's Hanover Trust Co.*, 80 Misc.2d 787, 363 N.Y. S.2d 880 (Civ.Ct., N.Y.Cty.1975).

■ In this case, after service upon it of the order of attachment, Morgan merely acknowledged the debt in its garnishee's statement. The Federal Reserve went one step further by also stating that it was placing a hold on the funds. Of greater significance, however, was their acknowl-

edgement at trial that since the order was first served upon them, both have continued to hold the funds subject to disposition by the Court. Thus, both garnishees "attorned" in fact, even though the unequivocal acknowledgment, at least in the case of Morgan, was not forthcoming until trial.

Upholding the levies on the theory of attornment makes practical sense on the facts of this case as well. If defendants had promptly moved as soon as the ninety day period expired, plaintiff could have relevied under the still viable order of attachment. It could then have commenced a turnover proceeding which, due to the impracticability of actually turning over millions of dollars to the marshal, the Court would have been fully prepared to stay pending resolution of this case. Alternatively, plaintiff could have moved under 6214(e) for an extension which the Court would have been prepared to grant for the same reasons. Defendant's delay effectively closed this course to plaintiff due to the intervening enactment of the Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94-583, 90 Stat. 2891, *codified in main* at 28 U.S.C. §§ 1602-1611 [hereinafter Immunities Act], discussed hereafter, which eliminated all attachments for jurisdictional purposes.

Where obstacles to physical turnover exist which cause the turnover proceeding to become largely ministerial in nature, New York courts have solved the problem by permitting plaintiff to extend its time to move under 6214(e) until after judgment in the main action. Apparently, in such circumstances, the motion may be made even after the levy has become void because Section 6214(e) does not, by its terms, require the motion to be made within the ninety day period.[20] *Seider v. Roth*, 28 A.D.2d 698,

---

**20.** This last factor represents a departure from prior New York practice. The old Civil Practice Act provision, Section 922(1) required the extension to be sought within the ninety day period. 7A Weinstein ⸢ 6214.15 (1977).

One federal case, construing the procedures outlined in Section 6214 insisted upon strict compliance with the statute and stated inciden-

tally that the motion for an extension of time must be made within ninety days of service of the attachment order. *Worldwide Carriers, Ltd. v. Aris Steamship Co.*, 312 F.Supp. 172, 175 n.5. (S.D.N.Y.1970). The cases relied upon, however, were decided under the prior statute which, as mentioned above, explicitly required the motion to be made during that period. *See,*

280 N.Y.S.2d 1005 (2d Dep't 1967) (attachment of liability insurer's obligation to defend). Therefore, while the motion under 6214(e) technically may be unnecessary where an attornment is established, since the statute requires it, the Court will at this time grant plaintiff's motion made at trial and extend plaintiff's time to commence the proceeding until 60 days after final judgment is entered in this case.

Defendants also have asserted that the attachment of the treasury bills at the Federal Reserve is constitutionally defective under the Supreme Court's recent decision in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). There, the Court held that all assertions of jurisdiction—including those labeled *in-rem* or *quasi-in-rem*—would henceforth have to meet the "minimum contacts" test first enunciated in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) as the standard for subjecting nonresident defendants to *in personam* jurisdiction. The Court indicated that where property itself is the subject matter or directly related to the litigation, its presence within the state would almost invariably provide a sufficient contact to satisfy this standard. Consequently, the impact of the decision falls most heavily upon procedures developed in the wake of *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) which held that the situs of a debt follows the debtor, thereby permitting a plaintiff to acquire *quasi-in-rem* jurisdiction over a defendant if his debtor-garnishee entered the jurisdiction. This principle has been applied in New York through the practice of permitting a plaintiff to attach the local assets of nonresident defendants to secure a jurisdictional base. N.Y.C.P.L.R. § 6201(1).

The funds held by Morgan were the source of payments made under the letter of credit or which would have been made but for the disputes which subsequently arose. Therefore, these funds would appear to have a sufficient nexus to plaintiff's cause of action to justify their attachment as a basis for *quasi-in-rem* jurisdiction. And, indeed, defendants have leveled no *Shaffer* challenge to that attachment.[21] Instead, their objection focuses on the attachment of the treasury bills at the Federal Reserve. Before trial, this attachment appeared much more vulnerable to a *Shaffer* objection. At trial, however, an officer of Morgan testified that its officials had a right to cause unlimited transfers of funds from the Federal Reserve to Morgan whenever, in the officials' discretion, the level of funds fell too low. Because of this, the attachment of the treasury bills at the Federal Reserve was not so different in character from that of the account at Morgan to which defendant made no objection. For this reason, and in light of the substantial delay in raising this ground (which could have been raised in a Fed.R.Civ.P. 12 motion to dismiss), the attachment of the treasury bills at the Federal Reserve need not be vacated.

### 2. In Personam

Prior to the passage of the Foreign Sovereign Immunities Act of 1976, litigants usually chose a *quasi-in-rem* attachment as the means of asserting jurisdiction over a foreign state or its agencies. As the defense of sovereign immunity was eroded through the judicial and executive branches' adoption of the restrictive theory of sovereign immunity,[22] the need for an effective method of gaining *in personam* jurisdiction grew. *See Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). Both components of the assertion of *in personam* jurisdiction—amenability to suit and method of

---

*Corwin Consultants, Inc. v. Interpublic Group of Companies, Inc.*, 375 F.Supp. 186, 195 (S.D. N.Y.1974), *reversed on other grounds*, 512 F.2d 605 (2d Cir. 1975).

**21.** The Court first brought the holding in *Shaffer v. Heitner* to defendants' attention in July, 1977 and requested that any objection under it

be made promptly. After several informal reminders, the defendants still did nothing until galvanized by the November scheduling of a trial to commence in several weeks.

**22.** *See* footnote 31, *infra*.

# 636

service—presented unique hurdles when traditional concepts of "presence" were applied to a foreign nation. For example, service upon a consular official, personally present within the jurisdiction, is ineffective to secure jurisdiction over the nation he represents.[23] *Purdy Co. v. Argentina*, 333 F.2d 95 (7th Cir. 1964), *cert. denied*, 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965); *see Hellenic Lines, Limited v. Moore*, 120 U.S.App.D.C. 288, 345 F.2d 978 (1965); *Vicente v. Trinidad*, 53 A.D.2d 76, 385 N.Y.S.2d 83 (1st Dep't 1976), *aff'd*, 42 N.Y.2d 929, 397 N.Y.S.2d 1007, 366 N.E.2d 1361 (1977); *but see, Renchard v. Humphreys & Harding, Inc.*, 59 F.R.D. 530 (D.D.C.1973).

In *Petrol Shipping Corp. v. Kingdom of Greece*, 360 F.2d 103 (2d Cir.), *cert. denied*, 385 U.S. 931, 87 S.Ct. 291, 17 L.Ed.2d 213 (1966); the Second Circuit held that *in personam* jurisdiction could be asserted over a foreign state. The basis for jurisdiction was established by the foreign state's contractual submission to jurisdiction coupled with the actual presence of the branch of the foreign state sued within the forum. After finding the defendant amenable to suit on these grounds, the court turned to the issue of the appropriate method of service. Noting that Fed.R.Civ.P. 4 governs only the method of service, without addressing amenability to suit, the court concluded that a foreign state and its agencies could not be equated with a foreign corporation to effect service under Rule 4(d)(3) or 4(d)(7).[24] In fact, none of the categories of persons in Rule 4 was found to be applicable. Consequently, the Second Circuit indicated that the appropriate response to this gap in the Rule would be to fashion a federal procedure under its rule-making power created by Fed.R.Civ.P. 83 for effecting service.

The panel added several comments: first, it stated that *Arrowsmith v. United Press International*, 320 F.2d 219 (2d Cir. 1963), which held that the amenability of a foreign corporation to suit in a diversity action was governed by state rather than federal standards, was not directly in point;[25] second, it indicated that the method of service upon a foreign state was a peculiarly federal concern; finally, it cautioned that it was not authorizing service on any representative of the sovereign but holding only that "service on the branch which is a party to the contract sued on is sufficient." 360 F.2d at 110.

The question which remains after a careful reading of *Petrol Shipping* is whether the Second Circuit, by explicitly holding that a foreign state and its agencies cannot be equated with a foreign corporation in order to dictate the method of service, implicitly displaced the *Arrowhead* rule that amenability to suit in diversity actions is governed by state law. It seems at least a tenable argument that if the manner of service on a foreign government is of federal concern, so are the circumstances under which such service shall be permissible. Moreover, reference to a state long-arm or "minimum contacts" theory fashioned with a private corporation in mind, may prove of little aid in evaluating whether a foreign nation should be subjected to suit. Thus, because the amenability requirement was

---

**23.** The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1608(a)(3) (Supp.1977) permits service by mail upon the head of a foreign ministry in certain circumstances.

**24.** In *Victory Transport v. Comisaria General*, 336 F.2d 354 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), the Second Circuit implicitly held that the manner of service on a foreign state and its agencies was governed by Fed.R.Civ.P. 4. Because of the substantial similarity of the agencies sued in *Petrol Shipping* and *Victory Transport*, the variant results in these two cases cannot be reconciled and, therefore, the later decision in

*Petrol Shipping* should be regarded as the Circuit's position. 4 Wright & Miller, Federal Practice and Procedure § 1111 at 450–51 (1969).

**25.** In *Arrowsmith*, the issue was whether Congress, in enacting Fed.R.Civ.P. 4, intended to displace state standards of amenability in diversity actions by the federal standards developed in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) and their progeny. The Second Circuit held that the potentially narrower state standard applied.

satisfied in *Petrol Shipping* and *Victory Transport* by the physical presence or a meaningful substitute for it through contractual submission to jurisdiction, the issue of whether a lower level of activity would suffice remained unresolved.

The Ninth Circuit, in *Republic International Corp. v. Amco Engineers, Inc.,* 516 F.2d 161 (9th Cir. 1975), interpreted *Petrol Shipping* to leave the *Arrowhead* rule undisturbed even where the action is against an agency of a foreign country. Consequently, the defendant agency's amenability to suit was evaluated under California's long-arm statute and upheld on the basis of visits made by the agency's employees to the jurisdiction in connection with the contract sued upon. Consistent with *Petrol Shipping* and *Victory Transport,* however, the actions of the agency sued, as distinct from some fictionalized presence of the foreign state based on the activities of its agents, had provided the requisite contacts with the jurisdiction.

In this case, the original cement contract was negotiated by the Federal Ministry of Defense in Nigeria and the letter of credit was issued by CBN. Neither instrument contained a submission to jurisdiction here (although it did have a choice of law provision—the "Law of New York City"), nor does either entity maintain an office or have employees here.[26] Therefore, with the traditional indicia of actual presence or "doing business" lacking, plaintiff has been forced to rely primarily on New York's long-arm statute, and specifically on those sections recognizing jurisdiction where the defendant transacts business here related to the causes of action in suit or commits a tortious act outside the jurisdiction but having consequences here. N.Y. C.P.L.R. § 302(a)(1), (3) (McKinney 1972).

In support of this claim, plaintiff produced evidence that the Federal Republic of Nigeria maintains substantial funds on deposit in the form of treasury bills with the Federal Reserve Bank. Additionally, CBN which, as its name denotes, functions as Nigeria's central bank and thus as an arm of the government,[27] maintains sizeable accounts with Morgan Guaranty, its correspondent bank. The funds at Morgan Guaranty, besides providing a pool for the payment of the letters of credit issued by Nigeria during its massive cement purchase, are also used to pay for any American produced goods Nigeria chooses to acquire. Moreover, Morgan officials have the power to transfer Nigeria's deposits held at the Federal Reserve to CBN's account at Morgan Guaranty if, in the officers' discretion, the level of deposits has fallen too low. In connection with its role as CBN's correspondent bank Morgan performs other incidental services. Finally, while the evidence showed that CBN employees were sometimes trained in New York by Morgan Guaranty, it was not established that any visits were made by CBN personnel specifically in connection with the cement letters of credit, prior to this litigation.

As the Court indicated during the trial, the nature and extent of defendants' "contacts" with the jurisdiction are such that if weighed only on the basis applied to private parties—activity having some nexus with the occurrence or transaction underlying suit of sufficient substance so as not to offend traditional due process concepts—many, if not most, foreign nations would have been amenable to suit here prior to the Act due to New York's predominance as an international commercial center. *See J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 227, 371 N.Y. S.2d 892, 333 N.E.2d 168 (1975), *cert. denied,*

**26.** While plaintiff asserts that the Nigerian airline maintains offices here, this factor does not give jurisdiction over other entities of the government or the government itself. *Vicente v. Trinidad,* 53 A.D.2d 76, 385 N.Y.S.2d 83 (1st Dep't 1976), *aff'd* 42 N.Y.2d 929, 397 N.Y.S.2d 1007, 366 N.E.2d 1361 (1977); see *Petrol Shipping* at 110.

**27.** The House Report which accompanied the Immunities Act specifically states that a central bank should be regarded as an agency or instrumentality of a foreign state. H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 15–16 *reprinted in* [1976] U.S. Code Cong. & Admin. News at 6604 [hereinafter House Report].

423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1976) (New York has "paramount interest" for purposes of choice of law in breach of international letter of credit due to its pre-eminence as financial capital.) As noted earlier, however, neither *Petrol Shipping* nor *Victory Transport* or their progeny within this Circuit go so far as to recognize *in personam* jurisdiction on the basis of contacts similar to those demonstrated here.

■ The uncertain state of the law regarding the amenability of foreign states to suit *in personam* and the circumstances under which the defense of sovereign immunity would be recognized led to the adoption of the Foreign Sovereign Immunities Act of 1976, which became effective January 19, 1977. *See generally*, Statement of President Ford (Oct. 22, 1976), *reprinted in* 75 Dep't St. Bull. 648 (1976). The objectives of the Act were to codify the restrictive theory of sovereign immunity, to transfer from the Department of State to the courts in all cases the determination of whether sovereign immunity should be recognized and to provide a comprehensive procedure for the maintenance of suits *in personam* against foreign states and their agencies. H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6604, [hereinafter House Report].

■ Of particular importance here is the amendment of Section 1330(b) which creates a federal long arm statute for acquiring *in personam* jurisdiction over foreign states and their agencies. The provision is patterned after that of the District of Columbia and incorporates the requirements of minimum jurisdictional contacts and adequate notice. House Report at 13. It may be invoked where immunity does not attach and the most relevant exception to immunity applies to any case:

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . . ." 28 U.S.C. § 1605(a)(2).

The liberal standards for acquiring *in personam* jurisdiction find their *quid pro quo* in the elimination of jurisdictional attachments. 28 U.S.C. § 1609. While such attachments were commonly used prior to the Act, their use created friction both because the fortuitous presence of property within the forum did not guarantee a nexus with the litigation and multiple attachments in various jurisdictions were often utilized. House Report at 26–27.

■ The parties have extensively briefed the issue of whether the Act should be retroactively applied to afford plaintiff a basis for acquiring *in personam* jurisdiction over the defendant. Defendant relies upon general statements that a statute should not be retroactively applied absent a clear congressional mandate. *Greene v. United States*, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Claridge Apartments Co. v. Commissioner of Internal Revenue*, 323 U.S. 141, 65 S.Ct. 172, 89 L.Ed. 139 (1944). Two judges of this district have refused retroactive effect for those provisions of the Act permitting removal of actions commenced in state courts against a foreign state. These cases turned, however, on the strict construction given removal statutes and the inadvisability of permitting removal of all cases pending on the effective date of the Act without regard to how far the proceeding had progressed. *Martropico Compania Naviera S.A. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina)*, 428 F.Supp. 1035 (S.D.N.Y.1977); *Rasu Maritama S.A. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara (Pertamina)*, 77 Civ. 263 (S.D.N.Y., March 7, 1977) (memo endorsement.)

In contrast, Judge Tenney recently applied the Immunities Act in determining a claim of immunity asserted in an action commenced before and premised on events occurring before the effective date of the Act. *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849 (S.D.N.Y., 1978).

As plaintiff points out, long-arm statutes have been retroactively applied to reach events occurring before their passage. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Schutt v. Commercial Travelers Mutual Acc. Ass'n,* 229 F.2d 158 (2d Cir.), *cert. denied,* 351 U.S. 940, 76 S.Ct. 836, 100 L.Ed. 1466 (1956). Moreover, as a letter from the Department of State to the Attorney General written after the Act was adopted states, any attachment for jurisdictional purposes attempted after the effective date of the Act would be void. Letter of Monroe Leigh, Legal Advisor to the Department of State to Edward Levi, Attorney General (November 2, 1976); *reprinted in* 75 Dep't St. Bull. 649 (1976). It follows that once jurisdictional attachments have been eliminated, *in personam* jurisdiction under the Act would be the only means of asserting jurisdiction, regardless of whether the events underlying the suit occurred prior to the effective date of the Act.

There remains only the application of the Act's standards to the events underlying this suit. The breach of the letter of credit having a New York beneficiary, advised by and payable through New York banks, would appear to satisfy the last criteria of 28 U.S.C. § 1605(a)(2) that jurisdiction exists over claims arising from an act committed outside the United States committed in the course of commercial activity having "a direct effect in the United States." NAC, however, commenced this action by utilizing the then available means of a jurisdictional attachment which the Court has held sufficient to assert jurisdiction over the defendants. In fact, jurisdiction under the Act was never asserted except in response to defendant's belated but substantial challenge to the *quasi-in-rem* jurisdictional base. Consequently, service was never effected according to its terms, nor has plaintiff, very understandably, ever relinquished its attachment of defendant's assets, attachments which would not be permitted today. Therefore, because this case has been litigated throughout on the assumption that only *quasi-in-rem* jurisdiction was asserted, and no amendment to the pre-trial order was sought to counter defendant's challenge to *quasi-in-rem* jurisdiction, plaintiff's claim must be limited to the funds attached.

## B. ACT OF STATE AND SOVEREIGN IMMUNITY

Defendants assert that plaintiff's injury was caused by certain governmental acts and, as such, they are insulated from liability by both the act of state doctrine and the defense of sovereign immunity. The latter will be discussed hereafter. They claim as acts of state both the embargo of the port in the fall of 1975, which was effectuated through two government decrees [28] and the amendment of the letter of credit, and the formation and subsequent actions of the Cement Contracts Negotiating Committee.

Defendants raise the act of state doctrine as if it were a talisman, affording blanket protection from all the consequences flowing from their response to the cement crisis. As the Supreme Court's last pronouncement on the subject indicates, however, no such sweeping effect to an act of state must be recognized. *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) arose following Cuba's nationalization of five major cigar exporting companies and involved their refusal to reimburse the concerns' former owners for amounts in payment of pre-nationalization cigar shipments. A majority of the Justices held that no act of state had been established due to defendants' failure to meet their burden of proving that the repudiation of the debt was "invested with sovereign authority" rather than resulting

---

**28.** The decrees are Government Notice No 1434, dated August 9, 1975, entitled "Regulations on Sailing and Arrivals on Vessels" which required all shipping companies to give Nigeria two months advance notice of sailing and other information. Decree No. 40 of the Ports Emer- gency Provisions provides that after December 19, 1975, vessels must not enter the port unless official permission has been granted and imposes seemingly criminal penalties for disregard of the decree.

from the asserted belief that the disputed amounts belonged to them.[29] *Dunhill* at 692–93, 96 S.Ct. at 1854. A plurality of the Justices chose to recognize explicitly an exception to the act of state doctrine where the sovereign's liability is premised upon its commercial activities. Proceeding on this theory, the plurality held that even if the repudiation of the debt had been "legitimatized" by the enactment of a decree confiscating the amounts owed, "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation." *Dunhill* at 695, 96 S.Ct. at 1861.

The Second Circuit, in *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977), characterized *Dunhill* as "reaffirm[ing] the doctrine in traditional terms" by refusing to extend it to situations where the sovereign is sued upon its commercial activity. Moreover, the panel held that, where the doctrine of act of state applies, it operates as an issue preclusion device, foreclosing from judicial inquiry the motives underlying and the validity of the acts of state. *Hunt* at 73, 77 & n.14.

Congress, in the House Report accompanying the Immunities Act, responded to the concern that while the Act officially restricted the defense of sovereign immunity, foreign states might escape liability by slipping through the "back door" created by the act of state doctrine. In downplaying this likelihood, the Report pointed to the decision in *Dunhill* as an example of judicial rejection of an improper assertion of the act of state doctrine. House Report at 20 n. 1. By emphasizing that commercial activity serves as the touchstone of both the *Dunhill*

decision and sovereign immunity under the Act, Congress seems to be suggesting that both theories be interpreted in tandem.

By invoking the act of state doctrine, defendants assert a blanket right to repudiate all their commercial obligations flowing from the original contract and letter of credit and the later Agreements of Discharge. As the Second Circuit interprets the act of state doctrine, it operates only to preclude issues from consideration— an effect which does not necessarily render an entire claim nonjusticiable. Thus, a complete defense to this claim, if it existed, would lie only in sovereign immunity. While the doctrines developed separately and remain distinct,[30] neither serves to insulate these defendants in this case from *all* the consequences of their actions.

Even assuming that the government decrees effectuating the embargo and the Cement Committee's actions qualify as acts of state, few consequences flow from the assumption. The majority in *Dunhill* made clear that the legal insulation surrounding an act of state is limited. Thus, like the distinction drawn in *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) that while a single act may have infinite effects, its legal consequences are nevertheless finite, so an act of state affords only limited legal protection.

In *Dunhill*, the continuing refusal to meet a commercial obligation was not viewed as part and parcel of Cuba's nationalization of the cigar exporting concerns. Nigeria's similar refusal to pay demurrage unquestionably due under the Agreements of Discharge (with, perhaps, appropriate offsets for over-payments of cement) simply is not

---

29. It was initially claimed that the retention of funds was a second act of state independent of the nationalization decree. It was not until reargument in the Supreme Court that the nationalized concerns asserted a more "typical" act of state theory. This was that the right to repudiate the debt was encompassed by the original decree nationalizing the businesses. Friedman & Blau, "Formulating A Commercial Exception to the Act of State Doctrine: *Alfred Dunhill of London, Inc. v. Republic of Cuba*," 50 St. John's L.Rev. 666, 679-80 (1976).

30. Traditionally, sovereign immunity raises a jurisdictional bar (technically, a relinquishment of jurisdiction previously acquired), while the act of state doctrine invokes choice-of-law concepts. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. at 705 n. 18, 96 S.Ct. at 1854. The latter, in the view of the Second Circuit, functions as an issue preclusion device. *Hunt v. Mobil Oil*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

an extension of the port embargo or the settlement negotiations.

■ While plaintiff's original theory of liability lay in defendants' anticipatory breach of the letter of credit occurring through the unilateral amendment of its terms to bring it into conformity with the new government policy, this does not mean that all of plaintiff's claims founder on the act of state doctrine. If the majority view of *Dunhill* is applied, Nigeria's continuing refusal to pay demurrage is not "invested with sovereign authority" by the separate sovereign acts of embargoing the port or executing settlements through the Cement Committee. Indeed, the very act of forming a settlement committee, paying for cement and processing demurrage documents, signifies an intent, espoused by the sovereign, to meet its commercial obligations. If the theory of the plurality in *Dunhill* is applied, (i. e., an exception to the doctrine for commercial acts), dishonor of a negotiated settlement agreement compromising purchase obligations falls squarely within the exception. In conclusion, while the act of state doctrine has some applicability, it does not materially aid defendants in escaping liability on those obligations which the Court may determine are currently owed to plaintiff.

■ Defendants similarly cannot prevail on the defense of sovereign immunity. This claim was raised early on in this litigation before Judge Weinfeld in defense to plaintiff's motion to prove the grounds of its attachment. *National American Corp. v. Federal Republic of Nigeria,* 420 F.Supp. 954 (S.D.N.Y.1976). At that time, defendants claimed that the cement purchase was intended for use in governmental works and military installations. Judge Weinfeld identified the claim as an effort to come within that branch of the rule of sovereign immunity, announced in *Victory Transport, Inc. v. Comisaria General,* 336 F.2d 354 (2d Cir. 1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), which recognized immunity for "acts concerning the armed forces." *National American Corp. v. Federal Republic of Nigeria* at 956.[31] Judge Weinfeld held that because the cement was not manifestly intended for military use, an issue of fact existed as to whether, at the time of contracting, the transaction was commercial or governmental.

There was almost a total failure of proof at trial as to the purpose for which the cement was ordered and, certainly, there was no convincing proof that the majority or a substantial portion was secured with a governmental purpose in mind. *Compare Aerotrade, Inc. v. Republic of Haiti,* 376 F.Supp. 1281 (S.D.N.Y.1974) with *Pan American Tankers Corp. v. Republic of Vietnam,* 296 F.Supp. 361 (S.D.N.Y.1969).

Even had this been demonstrated, it would not have materially aided defendants, since the Immunities Act changed the grounds on which the defense of sovereign immunity rests. The Act defines "commercial activity" for which sovereign immunity is not recognized as

> "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, *rather than by reference to its purpose.*"

28 U.S.C. § 1603(d) (emphasis added).

If any clarification of this language were needed, it is supplied by the House Report which states that "the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial na-

---

**31.** In *Victory Transport v. Comisaria General,* 336 F.2d 354 (2d Cir. 1964), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), the Second Circuit adopted the restrictive theory of sovereign immunity which eliminates the defense on claims arising from the commercial acts (jure gestionis) as opposed to the governmental acts (jure imperii) of a sovereign. The decision followed in the wake of the State Department's issuance of the well-known Tate letter adopting the restrictive theory as the official policy of the Executive Branch. 26 Dept. State Bull. 984 (1952). The process was completed by its codification in the Immunities Act. 28 U.S.C. § 1605(a)(2) (1977 Supp.); House Report at 7.

ture of an activity or transaction that is critical." House Report at 16, U.S.Code Cong. & Admin.News 1976 at 6615. This definition eliminates the significance attached by Nigeria to its purported intent to use the cement for military purposes. The question then remaining is whether this provision should be given retrospective effect.

Judge Tenney, relying upon the declaration of purpose incorporated into the Act that "[c]laims of foreign states to immunity should henceforth be decided by courts . . . in conformity with the principles set forth in this chapter," concluded that the Act should be applied retroactively even to cases commenced before its effective date. *Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y., 1978). The issue of retroactivity need not be determined here, however, because whether defendants' conduct is evaluated with reference to prior or current standards, the result is the same— sovereign immunity is no defense on the facts of this case.

## C. INDISPENSABLE PARTY

■ Defendants, in response to the pretrial motion to prove the grounds of the attachment,[32] sought dismissal under Fed.R. Civ.P. 19(b) on the ground that Intrafinsa was an indispensable party due to NAC's partial transfer to it of the letter of credit. Judge Weinfeld addressed this argument as follows:

"There is no showing that the absence of Intrafinsa, a Spanish corporation over whom jurisdiction cannot be acquired, will be prejudicial to the defendants. If plaintiff prevails, and upon a showing that assignments of a portion of plaintiff's claim are outstanding, recovery could be limited to such amounts that it would be entitled to under the letter of credit. Such recovery would not affect the rights of Intrafinsa or Natbank and would avoid any possibility of double recovery against the defendants. Moreover, the claim of lack of indispensable parties appears to dissolve, since both partial assignees reassigned all their rights in the letter of credit to plaintiff." *National American Corp. v. Federal Republic of Nigeria,* 420 F.Supp. 954, 957 (S.D.N.Y.1976).

The Court is convinced, after hearing all the evidence, that neither Intrafinsa nor Natbank has a remaining interest which would reduce plaintiff's recovery, since NAC reacquired sole rights by assignment from Natbank in April, 1976. This assignment, however, was subject to a previous assignment, made by Intrafinsa in February, 1976, to Ince & Co. of the demurrage due on the vessel Cherryfield. Both Morgan and CBN were notified of the assignment and Gero, in correspondence following the settlement agreements, requested these banks to effect the assignment by direct payments to Ince & Co.[33] The import of this will be considered subsequently.

## D. AGREEMENTS OF DISCHARGE

Plaintiff attempts to avoid the impact of the Agreements of Discharge on its large contract causes of action. First, NAC argues that the Discharge Agreements oper-

32. Also raised before Judge Weinfeld was the contention that the reassignment to NAC from Natbank was collusively effected, thereby raising the bar of 28 U.S.C. § 1359 (1970) which withdraws from the district courts the power to hear cases where jurisdiction is collusively invoked. Plaintiff demonstrated at trial to the satisfaction of the Court that the reassignment proceeded from plaintiff's belief that the Agreements of Discharge would be fully performed and that, in return, plaintiff gave up its rights to commissions due under other cement contracts.

33. Defendants also showed that in November and December, 1976, following the commencement of this lawsuit, Intrafinsa, Natbank and NAC negotiated with certain South American individuals to assign the proceeds of this litigation in an attempt to raise funds for legal fees. While some funds were received from one individual, the negotiations appeared inconclusive and would not act to reduce plaintiff's recovery.

Other assignments, set out in footnote 6, *supra,* related to cement payments and were honored by Morgan in its distributions for cement in the fall of 1975 and in March, 1976. Plaintiff claims that they were then cancelled.

ated as mere executory accords which, never having been performed due to defendants' failure to pay demurrage, left intact the contract claims. Second, it is argued that defendants used duress to induce plaintiff to execute the Agreements. Third, plaintiff claims that Delia exceeded her authority in accepting the terms of the Agreements.

### 1. *Substitute Contract*

 The significance of viewing an agreement as an executory accord, on the one hand, or a substitute contract, on the other, stems from the impact upon a creditor's existing contract claims. An executory accord is, by definition, "an agreement that an existing claim will be discharged in the *future* by the rendition of a substituted performance." 6 Corbin, Contracts § 1269 at 75 (1962) (emphasis added) [hereinafter Corbin]. The mere promise of future performance, therefore, does not act as a satisfaction of the creditor's present claims, which results only when performance is rendered. Failing performance, the creditor may elect to proceed upon his original claims. *Id.;* Restatement of Contracts § 417 (1932). In contrast, a substitute contract operates as its name implies—as an immediate discharge and satisfaction of existing claims in return for the new contract, even though performance is to commence in the future. Should a breach later occur, the creditor is limited to his rights under the substitute agreement. Restatement of Contracts § 418 (1932); 6 Corbin § 1269 at 81–2.

 It is apparent from even this brief consideration, that it is often difficult to distinguish between an executory accord and a substitute agreement. Authorities unanimously agree, not surprisingly, that the determination hinges upon the intention of the parties. *United Nations Korean Reconstruction Agency v. Glass Production Methods,* 291 F.2d 168, 172 (2d Cir. 1961); *Goldbard v. Empire State Mutual Life Insurance Co.,* 5 A.D.2d 230, 171 N.Y.S.2d 194

(1st Dep't 1958); Restatement of Contracts § 417–19 (1932); 6 Corbin § 1269. Intention, of course, may be demonstrated conclusively by the documents, in which ·case the conclusion is one of law, or by the circumstances surrounding the negotiations, at which point it becomes an issue of fact. *Goldbard,* 171 N.Y.S.2d at 199–200; *United Nations Korean Reconstruction Agency v. Glass Production Methods,* 291 F.2d at 172.

 Some recurring factual situations are said to have crystallized as indicia of intent, so that "courts hasten to find an intention to have a substituted or superseding agreement discharging the old where the settlement has resulted in formalized papers with unequivocal language." *Goldbard,* 171 N.Y.S.2d at 200; *Langlois v. Langlois,* 5 A.D.2d 75, 169 N.Y.S.2d 170 (3d Dep't 1957) (formalized proceedings in court point to substitute contract).[34] This rule serves to displace the preference for finding an executory accord, sometimes expressed as a presumption, which developed to mitigate the sometimes harsh effects of viewing a subsequent agreement as a substitute contract. *Goldbard,* 171 N.Y.S.2d at 200; Restatement of Contracts § 419 (1932); 15 Williston on Contracts § 1847 (3d ed. 1972) [hereinafter Williston]. Therefore, an agreement will not become immediately operative to discharge a claim if the agreement "does not so provide. If it does so provide, it operates accordingly and is a substituted contract." 6 Corbin § 1269 at 75.

 Applying these principles to the facts of this case, the language of the agreement serves as the best indicator that the parties intended a substitute contract. The Agreements acknowledge that the port congestion has rendered future performance impossible and continue, saying:

> "AND WHEREAS [Nigeria and CBN] and the Beneficiaries have decided upon mutual release and discharge from the terms of the said [contract and letter of credit]

---

**34.** In contrast, where the obligation is to pay a liquidated debt or an unliquidated over-due

debt, generally an executory accord is contemplated. Restatement of Contracts § 419 (1932).

NOW it is hereby agreed as follows: Each of the parties hereto hereby releases and discharges the other from all . . . claims and demands whatsoever which each of them now has or . . . had or may have . . .."

These statements can only be characterized as the "unequivocal language" of present discharge which, under *Goldbard*, indicates a substitute contract. Moreover, the Agreements of Discharge resulted from formalized proceedings which the parties regarded as such. NAC's invitation to the settlement negotiations prompted Gero and Arrau to meet for the purpose of drafting their settlement terms. These terms were later presented to the Cement Committee and accepted by it. While Gero and Arrau have indicated that they regarded the Agreements of Discharge as a "joke," their conduct, both before and after the negotiations, in preparing claims and demanding payment, indicate that the settlements were not so lightly treated. Certainly the Nigerians regarded them seriously when, confronted with the impossible condition in the port, they established a formal settlement committee and devised procedures to effectuate the Agreements. Moreover, Nigeria's obligation to pay demurrage cannot fairly be viewed as liquidated in amount, an indicator of an executory accord, since there was a continuing dispute over the applicable demurrage rate. Therefore, all the evidence gathered from an examination of the documents and the conduct of the parties signifies that a substitute contract, not an executory accord, resulted.

### 2. Duress

Plaintiff maintains that even if the Agreements of Discharge are viewed as substitute contracts, they are voidable because defendants' duress induced their execution. This position is unsound because the circumstances surrounding the settlement proceedings do not appear to fit within the traditionally narrow confines of the defense of duress. Calamari and Perillo, Contracts § 93 at 167 (1970).

Plaintiff relies upon that species of duress labelled "business compulsion" and defined generally by Williston as the use of "a wrongful or unlawful act or threat . . . which deprives the victim of his unfettered will." 13 Williston § 1617 at 704 (footnotes omitted). The wrongful act may be accomplished through lawful means, such as settlement negotiations, if they are used to trade upon the victim's poor financial condition with the improper purpose of securing personal advantage. A necessary element of the latter type of business compulsion, however, is a showing that the victim's financial straits were caused by the other party. The victim must also demonstrate that, in compromising an existing claim, his actions were precipitated solely by duress and without hope of personal gain. Williston § 1617.

There is no doubt that the disintegration of the parties' contractual relationship caused plaintiff some hardship which, in turn, may have led it to abandon substantial contract claims during the settlement negotiations. Plaintiff, however, has not carried its burden in showing that it acted from true business compulsion.

Many cases invoking the doctrine of business compulsion involve one party's deliberately withholding unique, essential goods or services at a critical time, thereby leaving the purchaser, who had contractual commitments to fulfill, with no choice but to accede to demands for premium prices. In such a case, the existence of a legal remedy is rendered illusory by the exigent circumstances. *Austin Instruments, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971); cases cited in Williston § 1618 at 722 n.5. Here, plaintiff's legal remedy not only was available, but was ultimately pursued.

Second, while plaintiff has repeatedly stated that only its desperate financial condition led it to accept the settlement, it is far from clear that NAC's financial straits were caused by defendants. Plaintiff has claimed that the shipowners were pressing it for payment of demurrage; however, there was no convincing evidence that this

was the case. In the summer of 1975, NAC transferred to Intrafinsa (which then assigned to Natbank) the bulk of the letter of credit in return for which Intrafinsa undertook to supply all the cement covered by NAC's contract. Natbank chartered the vessels; Intrafinsa's bank guaranteed demurrage payments to the shipowners. Intrafinsa's invoice, not NAC's, accompanied the demurrage documents when presented to Morgan in the fall of 1975. Therefore, it does not appear that the shipowners could have asserted claims against NAC for demurrage.

Third, Nigeria's breach of contract was precipitated by its physical inability to absorb more cement vessels into its port. Their continuing refusal to pay demurrage stemmed, in part, from disputes over whether the proper rate was a flat *per diem* one or a *pro rata* one based on tonnage and the "double" demurrage claims resulting when two suppliers shipped aboard the same vessel. There was also a demonstrated inability to verify which vessels were in their waters and for how long they had been there. Nigeria's conduct, therefore, was triggered to some extent by conditions inherent in the performance of the contract and, as such, does not constitute economic duress. The situation was somewhat similar to that in *Stewart M. Muller Construction Co. v. New York Telephone Co.*, 50 A.D.2d 580, 374 N.Y.S.2d 353 (2d Dep't 1975). There, defendant's threat to terminate a construction contract, if acted upon, would have caused plaintiff's financial collapse. Plaintiff alleged that this coercion led it to accept an amount in settlement far less than its actual damages. The Court held that this was insufficient for duress because the threat related to a dispute which stemmed from the contract itself.

Fourth, to prevail on the theory that Nigeria took advantage of plaintiff's shaky financial condition to achieve personal benefit, plaintiff would have to demonstrate Nigeria's wrongful motive and plaintiff's lack of hope for personal gain. Here, reso-

lution of the dispute, necessary to secure prompt payment, was to plaintiff's advantage and, therefore, conferred a benefit. As to proof of Nigeria's motive, it is on this extremely narrow ground where the doctrine of act of state comes into play. As discussed earlier, the doctrine forecloses from judicial examination the validity of and motivation behind the acts of a sovereign, which would render plaintiff's claim of duress non-justiciable.

Finally, and perhaps most importantly, it must be emphasized that duress merely renders a contract voidable. Thereafter, the victim may ratify the agreement by accepting its benefits. *Landers v. State*, 56 A.D.2d 105, 391 N.Y.S.2d 723 (3d Dep't 1977). Here, plaintiff accepted the payment in March for the cement never delivered, knowing either at that point or shortly thereafter, that the payment was not required by the terms of the Discharge Agreements. Instead of objecting and possibly seeking rescission, plaintiff retained the money and pressed for the demurrage payments, conduct unequivocally ratifying the Agreements. *Landers v. State, supra.*

### 3. Lack of Authority

The third ground upon which plaintiff seeks to disaffirm the Agreements of Discharge is that the agent Delia exceeded her authority in that the settlement terms did not comport with an instrument outlining Delia's authority. This express grant of authority was executed by Intrafinsa but not by NAC. Dr. Gero acknowledged in her testimony, however, that Delia was verbally authorized by her to represent NAC at the settlement negotiations.

The written authorization states that it is limited to a power to negotiate a settlement on terms no less favorable than payment of accumulated demurrage on "accepted" vessels at $3500 per day, payment of $1,778,000 in demurrage on vessels "not accepted," [35] a commitment for future demurrage pay-

---

**35.** "Accepted" was Arrau's designation for the first six vessels, while "not accepted" was the euphemism employed for the second six vessels.

ments at the same rate, and an agreement by Nigeria to accept delivery of 28,370 tons of cement at the contract rate.

■ The argument that the Discharge Agreements cannot be enforced against plaintiff because they were executed by an agent without authority is unfounded for several reasons. First, plaintiff relies upon Section 167 of the Restatement (Second) of Agency which states that a person who deals with an agent, and who is upon notice that the agent's authority is limited in a writing, is held to the limitations unless misled by the conduct of the principal. A member of the Cement Contracts Negotiating Committee acknowledged generally that the Committee verified each agent's authority before beginning negotiations. This general statement, however, cannot be construed as actual notice that Delia might be without authority to negotiate specific terms of the agreement. Moreover, since both Intrafinsa and NAC acted inconsistently with the written authorization (by agreeing to negotiate other terms) they misled the Nigerians as to the true extent of Delia's authority.

To understand why their acts were inconsistent with the written power, the sequence of the meetings among Delia, Arrau, Gero and the Negotiating Committee is crucial. The authorization was given in late January in New York at a meeting of Arrau, Gero and Delia. Thereafter, Delia went to Nigeria and returned to London to present two form agreements to Gero and Arrau on February 6 or 7, 1976. The agreements were not executed by either the Federal Ministry of Defense or CBN and the amount of tonnage to be accepted, if Gero's testimony is believed, was blank. Both agreements, however, unambiguously recited that payment was to be made only for cement already delivered or aboard vessels lying within Nigerian territorial waters. Moreover, Gero testified that the two provisos, prescribing the time of payment which were not part of the form agreements given to other cement suppliers, were part of the document. The rate of demurrage was unspecified, but the Nigerians did undertake

to pay both past and future demurrage until the vessels unloaded their cargoes.

No fair reading of the Discharge Agreements could imply an agreement to pay demurrage for ships which had never sailed to Nigeria. Similarly, the Agreements did not contain any commitment to accept additional cement. Thus, the unexecuted agreements varied substantially from the written authorization given to Delia one week earlier. Nevertheless, Arrau and Gero both executed the Agreements, so that Delia could return with them to Nigeria where they would be executed by the Nigerians sometime thereafter. By acting inconsistently with the express power, both can be viewed as having misled the Nigerians, with the result that the exception to Section 167 of the Restatement becomes operative.

■ A second, more conclusive reason, for not dissolving the Agreements on the ground of Delia's asserted lack of authority, is that by retaining the benefits of the Nigerian's performance, Gero and Arrau ratified the settlement. Even if we accept Gero's dubious claim that she signed the agreement in blank, she came to know its terms shortly thereafter. Where a principal, with full knowledge of the terms of a settlement, not only fails to repudiate it but also accepts its benefits, ratification results. *Burnham v. Layton,* 209 F.2d 237 (10th Cir. 1957). This rule applies even where knowledge is gained after receipt of the benefits. Restatement (Second) of Agency § 98 and comment (b) (1958). If plaintiff's version is accepted, Gero had knowledge of the terms of the settlement in mid-March, following the payment for the cement cargoes of the vessels which never sailed. Retaining the payment without comment, she pressed for payment of demurrage, acts which can only be viewed as acceptance of the agreements.

### III. *Damages*

Despite the findings on liability, it appears that plaintiff is not entitled to recover a judgment against defendants. Plaintiff's damage claim in the pre-trial order was $11,471,114.42 which encompassed

claims for demurrage at the flat *per diem* rate on six vessels, lost profits on both the undelivered cement and unoccasioned demurrage for the vessels which would have been necessary to transport it, charter expenses and incidental expenses. At trial, there was a total failure of proof on the expense items due to the allegedly unexpected unavailability of Arrau which was, in all likelihood, deliberate on his part. As to lost profits, these were premised on breach of the letter of credit and cement contract, which the Court finds were superceded by the Agreements of Discharge. As to liability under the latter documents, plaintiff has recognized that the payment for undelivered cement in March, 1976 must be offset from any recovery for demurrage.

If demurrage were calculated for all six vessels to the point when they were finally discharged, the demurrage owing would be $2,588,999, as computed on the attached Schedule A. (This computation draws all inferences favorable to plaintiff and ignores both the hearsay rule [36] and the fact that no documents on three vessels were submitted for the period spanning February 7, 1976, when documents were submitted under the Agreements of Discharge, to the summer of 1976, when the vessels were finally discharged.) [37] The overpayment for cement made in March was $1,992,000. The amount of demurrage attributable to the Cherryfield, to which plaintiff could acquire no interest through the reassignment from Natbank, is $903,-420. Therefore, the calculation appears as follows:

| | |
|---|---|
| $2,588,999 | Demurrage unpaid under settlement |
| − 903,420 | Demurrage attributable to Cherryfield |
| $1,685,579 | Demurrage due to plaintiff |
| −1,992,000 | Cement overpayment under settlement |
| —0— | Positive balance owed to plaintiff |

This result makes it unnecessary to consider other possible offsets suggested by defendants. For example, circumstantial proof was submitted tending to show that the vessel Rio Doro left Lagos in November, 1975 for a substantial period of time and then returned for unloading. While plaintiff disputes its absence, it has been unable to prove its whereabouts since the vessel apparently was scrapped at some point and its documents destroyed. Plaintiff has, therefore, failed to maintain its burden of proof as to a substantial part of the Rio Doro's demurrage claim.

Additionally, defendants claimed the right to off-set amounts paid in the fall of 1975 for the cargoes aboard the Jotina and Joboy. The cargoes were never received because the ships departed from the harbor without unloading when the shipowners allegedly exercised their liens and resold the cargo due to non-payment of demurrage. Even if we view these actions as justified, plaintiff has an obligation to mitigate damages and since these proceeds would serve to reduce plaintiff's potential liability to the shipowners for demurrage, the amount received for the cargoes would reduce plaintiff's claim. Plaintiff failed to establish how much had been realized. If we merely offset the two vessels' demurrage claims, it would be $561,925. If we offset the entire amount paid for the two cargoes, it is $786,-000.

**36.** At trial, plaintiff relied upon the demurrage documents submitted to Morgan in November, 1975. Since the documents were prepared and maintained by Intrafinsa, they could not be admitted as business records through the testimony of Gero, and failed to fit any other exception to the hearsay rule except possibly Fed.R. Evidence 803(24), which permits the introduction of such evidence if it has circumstantial guarantees of trustworthiness and notice was given before trial of intent to offer. Since the similar documentation submitted for the second six vessels proved to be fraudulent, it cannot be said that these documents had circumstantial guarantees of trustworthiness. Moreover, no advance notice was given, a requirement which the Second Circuit has recently indicated must be strictly complied with. *United States v. Ruffin*, 575 F.2d 346 (2d Cir., Feb. 27, 1978).

**37.** Even if we consider the documents introduced by defendants, demurrage claims were substantiated only through February 7, 1976. While these established periods of demurrage for three vessels (Naimbana, Jotina and Joboy), the unloading dates of the three other vessels remained uncertain. Post-trial submissions clarified the issue, and defendants' contentions with regard to the dates for the disputed three vessels have been accepted.

Both of the foregoing points have substantial merit. Had the right to the Cherryfield demurrage been reacquired by NAC, the amounts involved in the latter two offsets would, in any event, eliminate any affirmative recovery. The Court reached its conclusion on damages somewhat reluctantly, knowing that plaintiff pressed its rights vigorously during this litigation and realizing that substantial disruption to plaintiff's affairs was caused by the defendants' original breach of contract. The Agreements of Discharge, however, limit the plaintiff's remedy and cannot be ignored.

The Clerk shall enter judgment for defendants.

SO ORDERED:

## APPENDIX

Schedule A: Demurrage Calculation (pro rata) [*]

| Vessel | Tonnage Carried | Arrival | Departure | Number of Days On Demurrage | Total |
|---|---|---|---|---|---|
| Cretan Life | 500 M.T. | 8/27/75 | 8/ 7/76 | 347 less 1 layday 346 days | $ 60,550 |
| Naimbana | 2,730 M.T. | 9/ 4/75 | 11/23/75 | 81 less 3 laydays 78 days | 74,529 |
| Jotina [**] | 5,600 M.T. | 9/12/75 | 1/25/76 | 136 less 6 laydays 130 days | 254,800 |
| Rio Doro | 10,500 M.T. | 10/ 6/75 | 7/10/76 | 279 less 10 laydays 269 days | 988,575 |
| Cherryfield | 10,800 M.T. | 10/ 8/75 | 6/12/76 | 249 less 10 laydays 239 days | 903,420 |
| Joboy [**] | 7,500 M.T. | 9/22/75 | 1/24/76 | 125 less 8 laydays 117 days | 307,125 |
| | | | TOTAL DEMURRAGE DUE | | $2,588,999 |

[*] $.35 per ton per day without regard to $3500 per day ceiling.

[**] Cargo never delivered.