**EAST EUROPE DOMESTIC INTERNA-TIONAL SALES CORP., Plaintiff,**

v.

**TERRA, Defendant.**

**No. 77 Civ. 4187 (IBC).**

United States District Court,
S. D. New York.

March 13, 1979.

384

Bailey, Marshall, Hoeniger & Freitag, New York City, for plaintiff; Berthold H. Hoeniger, New York City, of counsel.

Arutt, Nachamie & Benjamin, P. C., New York City, for defendant; Alex Spizz, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

In this action brought by a New York corporation against a Romanian trading company, jurisdiction is alleged under the Foreign Sovereign Immunities Act of 1976, Pub.L. No. 94–583, 90 Stat. 2891 (1976), codified as 28 U.S.C. §§ 1330, 1601–1611 and amending 28 U.S.C. §§ 1391, 1441. Plaintiff seeks to recover compensatory and punitive damages allegedly caused by defendant's interference with a contract between plaintiff and a third-party and by defendant's alleged wrongful interference with plaintiff's trade and business.

Plaintiff has moved for partial summary judgment on the issue of liability, an expedited trial if summary judgment is denied and for permission to withdraw its demand for a jury trial since juries are forbidden under section 1330(a). Defendant, which

initially appeared *pro se*, asked leave to file an amended answer and cross-moved for summary judgment on the grounds that this Court lacks jurisdiction in personam and, in the event that this Court has jurisdiction, that this dispute should be submitted to arbitration.

Plaintiff's motion to withdraw its jury demand heretofore has been granted. Mem.Dec. March 28, 1978. On June 20, 1978, we directed the parties to "delve further into the threshold issue of personal jurisdiction." We now find that this Court lacks personal jurisdiction over the defendant and order that plaintiff's complaint be dismissed.

Facts Relating to the Transaction at Issue

In describing the facts, the Court has endeavored to resolve all ambiguities in favor of plaintiff, the party opposing the motion to dismiss. *Pneuma-Flo Systems, Inc. v. Universal Machinery Corp.*, 454 F.Supp. 858, 862 (S.D.N.Y.1978).

Plaintiff East Europe Domestic International Sales Corp. ("East Europe") is a "domestic international sales corporation" pursuant to the special provisions of section 992 et seq. of the Internal Revenue Code. It is a New York corporation and maintains its corporate headquarters and sole office in New York City.

On or about March 1, 1977, plaintiff entered into a contract with Vitrocim, a Romanian company, to purchase 20,000 metric tons ("mtons") of Portland cement at a price of $25.00/mton. The contract was negotiated by plaintiff's President, Robert Ross, while on a trip to Bucharest, Romania during the winter of 1977. As the date for delivery under the contract preceded the date of its execution, various changes in the contract were anticipated and needed. Plaintiff negotiated these changes with Vitrocim through the Office of the Economic Counselor of the Embassy of Romania in New York City and by telex communication. Vitrocim requested that the contract should be amended to include, *inter alia*, the requirement that a letter of credit "has to be received by Vitrocim not later than April 10, 1977," (Easter Sunday). Affidavit of Robert Ross in Support of Plaintiff's Motion for Partial Summary Judgment, dated December 5, 1977, Exh. 3 ("Ross affidavit"). By telex of March 17th, East Europe accepted this amendment. Tlx Nr. 15466, *id.*, Exh. 4.[1]

Throughout March and early April, 1977, plaintiff asserts, the world price of cement was rising. By telex dated March 24, 1977, plaintiff had its first contact with Terra. The Telex reads:

Kind Att Mr. Robert Ross

We have been informed that you bought 20.000 Mtons Romanian cement . . . from Messrs. Vitrocim, delivery in April 1977. We are ready to take over this quantity from you in same conditions as yours with Messrs Vitrocim at price of US Doll 26.10/Mton.

Pls act very fast.

Regards Terra 2C

Tlx Nr. 2061/2C, Ross affidavit, Exh. 9.

Plaintiff replied by return telex expressing its willingness to enter into a deal with Terra, at a price of $27.00/mton, provided that Terra established an irrevocable, confirmed and transferable letter of credit in favor of Vitrocim by March 28, 1977,[2] the letter of credit to be confirmed by Vitrocim. Terra was required to pay plaintiff the $2.00/mton difference in price from the price under the Vitrocim contract by cabling $44,000.00 to a John Foster at Chase Manhattan Bank in New York City. Tlx Nr. 15536, *id.*, Exh. 10.

After negotiating by telex over the next several days, plaintiff, Vitrocim and Terra agreed on a price of $26.25/mton, with 40

---

1. The actual addendum executed by Vitrocim on March 28th, and not received by plaintiff until April 7th provides: "Letter of Credit in good order and with all details must reach the Romanian Bank for Foreign Trade Bucharest latest April 1o, 1977 [sic] otherwise the contract may be cancelled by the Seller." Ross affidavit, Exh. 8.

2. Subsequently, plaintiff extended Terra's time to open the letter of credit until March 29, 1977.

cents of plaintiff's $1.25 profit going to Vitrocim as commission. The three-way deal, however, ultimately fell through. Although Terra represented, on at least two separate occasions, that it had established a letter of credit in favor of Vitrocim, Tlx Nrs. 2195/2C, 2203/2C, *id.*, Exhs. 19, 21, and plaintiff repeatedly requested confirmation of this fact from Vitrocim, Tlx Nrs. 15615, 15665, *id.*, Exhs. 22, 29, Vitrocim failed to answer until April 7th.[3]

On April 7th, Vitrocim responded to an East Europe telex sent on April 5th: ". . . we did not receive the Elcee [letter of credit] and we think we would not receive it as far as matters were still not clarified." Tlx FS 4941/HM, *id.*, Exh. 33. Plaintiff unsuccessfully protested to Vitrocim by return telex that it had waited since March 31st for confirmation of the opening of a letter of credit and asked for additional time to open one. Tlx Nr. 15684, *id.*, Exh. 34. Plaintiff also telexed Terra, stating that it would hold Terra responsible for all damages "occurred by your failure to open your letter of credit as you had advised us you had done." Tlx Nr. 15685, *id.*, Exh. 35.

On April 8th (Good Friday) Terra responded to plaintiff:

. . . . Messrs Vitrocim Bucharest advised us that you requested from them 40,000 mtons cement instead of 20.000 mtons. Due this is not possible and you already engaged 20.000 mtons with another partner, and in order to avoid troubles with your partner to whom you already sold cement, we renounce to this deal and on this line we already cancelled formalities for letter of credit in favor of Messrs. Vitrocim Bucharest

Regards

Terra 2C

Tlx Nr. 2383, *id.*, Exh. 36. Plaintiff attempted to save the deal, but was unable to alter Terra's position. Tlx Nr. 15706, *id.*, Exh. 37.

The April 8th telex from Terra was plaintiff's last contact with Terra until commencement of the instant litigation. Plaintiff and Vitrocim continued to trade telexes through April 13th but were unable to resolve their differences and their contract was cancelled.

On August 24, 1977, plaintiff filed its complaint naming Terra as the sole defendant. Plaintiff seeks compensatory and punitive damages primarily on the theory that Terra and Vitrocim conspired to thwart performance of plaintiff's contract to enable both companies to take advantage of the rising world price of cement. As we find that this Court lacks personal jurisdiction over Terra, we do not address ourselves to plaintiff's motion for summary judgment on the issue of liability.

### Personal Jurisdiction Under the Foreign Sovereign Immunities Act of 1976

Plaintiff alleges that this Court has jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("the Act"), effective January 19, 1977. Pub.L. No. 94–583, 90 Stat. 2891 (1976), 28 U.S.C. §§ 1330, 1601–1611 and amending 28 U.S.C. §§ 1391, 1441. The Act codifies the principle of "restrictive" sovereign immunity in that, under international law, foreign states are immune from suits based on their public acts, but not on their commercial or private acts. Prior to the Act, the decision on whether an action was public or commercial was made by the executive branch. The Act now specifically enumerates those actions which may be termed commercial and grants the United States District Courts original juris-

---

**3.** During this same period, plaintiff seems to have confused Terra as to whether the cement Terra was purchasing was subject to a prior sale. In a telex on March 30th, plaintiff informed Terra, allegedly by mistake, Ross affidavit ¶ 7 at p. 8, that the cement was "subject to prior sale [and] we regret to inform you that we have sold this cement." Plaintiff claims that it meant to say, "we are selling this cement." *Id.* On April 4th, plaintiff also attempted to purchase an additional 20,000 mtons from Vitrocim, Tlx Nr. 15650, *id.*, Exh. 26, but was told that Vitrocim could not "offer any additional quantities." Tlx FS 4823/HM, dated April 7, 1977, *id.*, Exh. 28.

diction over disputes involving them.[4] H.R. Rep.No.94–1487, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S.Code Cong. & Admin. News, pp. 6604, 6605–06.

Section 1330(a) gives federal district courts original jurisdiction, "without regard to amount in controversy," over:

> any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

The parties herein do not allege the applicability of an international agreement.

Section 1330(c) makes it clear that the District Court will not have personal jurisdiction unless the claim for relief arises "out of any transaction or occurrence enumerated in sections 1605–1607 of this title." 28 U.S.C. § 1330(c).

Section 1605(a)(2) explicitly applies to the case before us:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

A "foreign state" is defined to include "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality" includes "any entity" which:

> is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof.

*Id.,* § 1603(b)(2). Terra concedes that, for purposes of the Act, it is a foreign state. Def's Mem. of Law in Opposition to Plaintiff's Motion for Summary Judgment on the Issue of Liability, p. 3.

The Act is intended to be a long-arm statute. Modelled after the District of Columbia long arm statute, it is designed to embody the "requirements of minimum jurisdictional contacts and adequate notice." H.R.Rep.No.94–1487 at p. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News at p. 6612, *citing International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Section 1605's itemization of non-immune transactions is a prescription of "the necessary contacts which must exist before our courts can exercise personal jurisdiction." H.R.Rep.No. 94–1487 at p. 13. To find personal jurisdiction over Terra we must be satisfied that the due process requirements incorporated in section 1605(a)(2) have been met.

### Terra's Contacts with the United States

Personal jurisdiction over Terra under section 1605(a)(2) will be present if we find that Terra either (1) conducts commercial activity in the United States; or (2) performed an act in the United States in connection with its commercial activity elsewhere or (3) acted outside the United States in connection with its commercial activity and that act caused a "direct effect in the United States."

Commercial activity is defined as a "*regular course of commercial conduct or a particular commercial transaction or act.* The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its

---

4. The grant of jurisdiction to the district courts is original, but not exclusive. See 28 U.S.C. § 1605(a).

purpose." 28 U.S.C. § 1603(d) [emphasis supplied]. "[C]ommercial activity carried on in the United States" means "commercial activity carried on by such state [the foreign state] and having *substantial contact* with the United States." *Id.* § 1603(e) [emphasis supplied].

We will deal with each of the three possible jurisdictional bases in turn.

1. *Does Terra carry on commercial activity in the United States?* Terra is a Romanian state-owned trading corporation. Its principal activities are export, import and re-export. Founded in 1970 on an experimental basis, Terra achieved permanent status in 1971. In examining Terra's activities in the United States since 1970, we must determine whether they are sufficiently "continuous and systematic" to satisfy the demands of due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 317–19, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Prior to the instant dispute, Terra had dealt with other companies in the United States, but only at arms-length and usually by telex. Nicolae Gheorghiu, a Department Chief of Terra, states that since Terra's inception its "sales to the United States accounted for less than 1% of TERRA's total business with foreign nations." Reply Affidavit, dated April 28, 1978, ¶ 7. When questioned about the one percent figure, Dipl. Ing. Gr. Logafatu, Chief of Terra's Export, Import and Re-Exportation Department explained that the "percentage is too big . . .—the actual percentage is negligible. . . ." Deposition of Terra by Logafatu, Sept. 26, 1978, p. 13, lns. 20–22 ("Terra Dep.").

Apart from very few and scattered contacts, there is no evidence of systematic or continuous activity in the United States by Terra. The proof adduced by the parties shows that until August, 1977, when this suit was commenced, Terra had never: maintained an office in the United States; sent representatives or salesmen to the

United States; entered into any contracts with United States companies either for the purchase or sale of goods; or engaged in any organized publicity in the United States.[5]

We cannot find that Terra has "purposely availed itself of the privilege of conducting business in the United States." See *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. Washington, supra*.

2. *Has Terra performed an act in the United States in connection with its commercial activity elsewhere?* This portion of section 1605(a)(2) "looks to conduct of the foreign state in the United States which relates either to a regular course of commercial conduct elsewhere or to a particular commercial transaction concluded or carried out in part elsewhere." H.R.Rep.No.94–1487, p. 19, *reprinted in* [1976] U.S.Code Cong. & Admin.News at p. 6617. We find on the facts heretofore discussed that Terra has not performed an act in the United States in connection with its commercial activity abroad. We find no presence of Terra in the United States and, hence, no jurisdiction over Terra under this part of the clause.

3. *Has Terra acted outside the United States in connection with its commercial activity and has that action caused a "direct effect in the United States"?* This phrase in section 1605(a)(2) requires us to examine defendant's contacts with the United States in connection with the specific transaction at issue. Cases construing the District of Columbia long-arm statute, on which section 1605 is based, have held that negotiations without more are insufficient for an assertion of in personam jurisdiction. *See, e. g., Textile Museum v. F. Eberstadt & Co., Inc.*, 440 F.Supp. 30 (D.D.C.1977), *Bueno v. La Compania Peruana de Radio-Difusion*, 375 A.2d 6 (D.C.Ct.App.1977). The court "should undertake an analysis of the quality and nature of an activity in relation to a

---

**5.** Terra has a listing in the Romania Pocket Commercial Guide *1970*—a description of Romanian trading companies and Romania's Economic and Commercial Offices abroad. We do not regard this as evidence of merit that Terra actually conducted business in the United States.

forum state" to determine if the defendant has "projected itself" into the United States. *Textile Museum v. F. Eberstadt & Co., Inc.*, 440 F.Supp. at 32.

In a recent case decided under the Act, the Court of Appeals for the Second Circuit applied an "entering the marketplace" test in finding no personal jurisdiction over the country of Libya and a Libyan company. *Carey v. National Oil Corporation*, 592 F.2d 673 (2d Cir. 1979) (per curiam). The company had entered into a contract with a Bahamian subsidiary of a New York corporation for the delivery of oil. In an action by the parent company and an assignee of the Bahamian subsidiary based on defendant's alleged failure to deliver the oil, the court found no "direct effect in the United States" under section 1605(a)(2). Even if the Libyan government was aware that the oil would be channeled into the United States, the court found insufficient "minimum contacts" and stated that "there was no real entering of the marketplace in the United States." At 676–677.

As has been described, the entire course of dealing between East Europe and Terra was by telex. It is undisputed that Terra initiated the transaction with its telex of March 24th. Had the deal materialized, Terra would have paid East Europe by cabling funds to plaintiff's New York bank. The rest of the transaction is located in Romania. The cement was never supposed to leave Romania. Under plaintiff's contract with Vitrocim, the letter of credit to be established in favor of Vitrocim, was to be payable in Bucharest. Ross affidavit, Exh. 1. Plaintiff claims, however, that evidence of Terra's purposeful activity in the United States can be derived from other contacts which relate to the instant dispute.

■ In March, 1978, after this litigation had been commenced, Terra sent company representatives to the United States. Its dual goal, apparently, was to try to settle this matter and to obtain additional business. Terra emerged from the trip without a settlement, but with a contract with another American company, Amicale. Defendant represents that this trip was the first ever made by a Terra representative to the United States. The contract with Amicale was Terra's first with an American company. We decline to base personal jurisdiction on defendant's contacts with the United States after formal litigation over the instant dispute has been commenced and, in fact, after the instant motion for summary judgment was made. Cf. *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87 (2d Cir. 1975) (Settlement negotiations cannot be the basis for jurisdiction where unrelated to the subject matter of the litigation or where they result in a release of claims between the parties. Settlement negotiations occurred prior to commencement of the action.)

■ Plaintiff claims that Terra was represented in New York by the Office of the Economic Counselor and that this principal-agent relationship was a sufficient contact for this Court to have in personam jurisdiction over defendant. Plaintiff claims that it negotiated with Terra and Vitrocim through the Economic Counselor's office. It is clear that plaintiff negotiated with Vitrocim through Mr. Sapotoru, the Assistant Economic Counselor. Once Terra became involved, Robert Ross, plaintiff's president, communicated with Sapotoru almost daily. Ross testified that he hoped Sapotoru would pressure Terra into further confirmation of its opening of the letter of credit. When the contract negotiations broke off, Ross complained about Terra to Sapotoru, Napolen Fodor, the Economic Counselor, as well as to the Romanian ambassador.[6] Dep. of plaintiff, by Robert Ross, dated July 5, 1978.

Defendant refutes the agency theory by submitting a letter from Fodor, the Eco-

---

6. East Europe also argues that the publication, "Romania Pocket Commercial Guide 1970," see fn. 5, *supra*, is further evidence of the principal-agency relationship because the names given some of Romania's "Economic and Commercial Offices Abroad" include words like "agency" or "representation." We cannot accept the argument that name is necessarily descriptive of function.

nomic Counselor himself, denying any such representative capacity. Dated April 21, 1978, on Romanian Embassy stationery, and addressed to defendant's attorneys, Arutt, Nachamie & Benjamin P. C., it reads, in pertinent part:

We hereby confirm what we have told you verbaly [sic] and namely that the activity of this Office is as per art. IX of the Agreement on Trade Relations between the Socialist Republic of Romania and the United States of America, signed in Bucharest on April 2, 1975 and ratified on August 3 the same year.

In fact the activity of this Office and its members (including my assistant Mr. Constantin Sapatoru, you referred to) is to promote trade relation between Romanian and U.S. companies, to provide assistance to Romania and US companies and economic organizations in carrying out their trade.

As a consequence we are not participating directly in the negotiation, execution or fulfillment of any trade transactions. [sic]

As cited by defendant, Article IX, ¶ 2 states:

The governmental commercial offices, the members and the personnel of these offices, as far as they have been granted diplomatic immunity, will not participate directly in the negotiations, execution or fulfilling of the commercial transactions, or to do any other commercial acts. [sic]

Spizz, Affidavit in Opposition, dated April 21, 1978, ¶ 6. In addition, Terra denies ever asking the Office of the Economic Counselor to assist in the negotiations with East Europe. Terra Dep. p. 28.

■ While the activities of an agent may be attributed to the principal for jurisdictional purposes, *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970), *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967), we do not find an agency relationship between the Office of the Economic Counselor and Terra. The Office of the Economic Counselor, at most, acted to facilitate the transaction. It was not Terra's authorized representative.

■ We find that Terra's sole contacts with the United States in the course of the transaction in dispute are the telexes which comprise the negotiations between it and plaintiff. Although Terra made the initial communication, we find that the March 24th telex does not constitute activity having a "direct effect" in the marketplace of the United States; it is an insufficient factor upon which to confer jurisdiction.

■ East Europe claims that its injury in tort consists of damages occasioned by Terra's interference with its trade or business. Had Terra not represented that it had established the letter of credit, plaintiff asserts, the contract with Vitrocim would have been performed and plaintiff would have sold the cement to another customer. The alleged tortious activity took place outside the United States. The purported injury took place in the United States only because the plaintiff is domiciled or doing business here. This, too, is an insufficient contact for due process purposes. *See, Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir. 1975) (construing the New York long-arm statute's section on jurisdiction when tortious activity occurs outside the state, CPLR § 302(a)(3), and finding no jurisdiction on this basis.)

Defendant has no other contacts with the United States besides negotiations. Plaintiff's reliance on *National American Corporation v. Federal Republic of Nigeria*, 448 F.Supp. 622 (S.D.N.Y.1978), is misplaced. The facts here do not include the formal letter of credit "having a New York beneficiary, advised by and payable through New York banks" which Judge Goettel found sufficient, in dicta, to satisfy the requirements of section 1605(a)(2). *Id.* at 639. Here we are forced to analyze a series of telexes relating to a transaction which, for one reason or another, was never consummated to decide if there is minimal contact with the United States sufficient to satisfy due process.

Disposition

For the foregoing reasons, plaintiff's motion for summary judgment to the extent not previously decided is denied. Defendant's cross-motion for summary judgment is granted. Plaintiff's complaint is dismissed.

Settle order on notice.