TEXAS TRADING & MILLING CORP., Plaintiff,

v.

FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.

No. 78 Civ. 2395(JMC).

United States District Court,
S. D. New York.

July 16, 1980.
As Amended Aug. 18, 1980.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City (Richard H. Webber, New York City, of counsel), for plaintiff.

Kissam, Halpin & Genovese, New York City (James G. Simms and Laurence May, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

The defendants' motion to dismiss the complaint for lack of subject matter and personal jurisdiction is granted. Fed.R. Civ.P. 12(b)(1), (2).

## FACTS

Plaintiff, a New York corporation with its principal place of business in New York City, has commenced this action under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1391, 1441, 1601–1611, for anticipatory breach of a contract for the purchase of cement and of a documentary letter of credit established pursuant to that contract. On March 8, 1975, plaintiff entered into a contract with the Federal Republic of Nigeria ["Nigeria"], wherein Nigeria agreed to buy from plaintiff 240,000 metric tons, plus or minus 10% at seller's option, of Portland Cement for the price of $60 (U.S.) per ton, or a total of $14,400,000. Nigeria agreed to establish within 21 days after the contract was signed, "an Irrevocable, Transferable abroad, Divisible and Confirmed Letter of Credit in favour of the seller for the total purchase price through Fidelity International Bank of 99 William Street, New York, U.S.A." Defendants' Notice of Motion, Exhibit 2, at 2 (filed Dec. 20, 1979). Shipment was to be made at the rate of 20,000 metric tons *per mensem* commencing 30 days after receipt of the letter of credit. The contract provided for the payment of demurrage not exceeding $4,000 *per diem* per vessel, whenever the discharge of cargo was not completed at the rate of at least 1,000 tons *per diem*, provided the seller gave notice to the buyer of the departure from the port of loading of each consignment. Demurrage was to be payable, under the terms of the letter of credit, on presentation at the bank of time–sheets and statements of facts duly certified as correct by the ship's master and the ship's agents in Lagos Apapa, the main port of Nigeria. The contract further provided that it would be governed by the laws of Nigeria, and that all disputes arising under it would be submitted to arbitration before the International Chamber of Commerce, Paris, France.

On April 23, 1975, the Central Bank of Nigeria ["Central Bank"], which is an "agency or instrumentality of a foreign state" within the meaning of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1603(b), established and confirmed its Documentary Credit No. CBN/BO/75/86 in favor of plaintiff for the full contract price. The letter of credit is governed by the Uniform Customs and Practice for Documentary Credits (The International Chamber of Commerce Brochure No. 222) (1962 Revision). The confirmed, irrevocable letter of credit was advised and made payable through Morgan Guaranty Trust Company ["Morgan"] in New York, with instructions that the credit be advised through Fidelity International Bank in New York. Morgan did not, however, add its own confirmation to the letter of credit.

Plaintiff alleges that it thereafter entered into a contract with a Spanish supplier for the purchase of 240,000 metric tons of Portland Cement, and delivered 39,590 metric tons to Nigeria. During the course of these deliveries, $4,484,476.87 in demurrage was incurred, of which $2,102,305.20 was paid by Nigeria.

Plaintiff's cement purchase contract was only one in a massive cement purchase program undertaken by Nigeria's Ministry of Defense.[1] What the Ministry appears not

---

1. Nigeria entered into approximately sixty-eight contracts with international suppliers for an aggregate of over twenty million metric tons of Portland Cement. *See National American* *Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir. 1979).

to have anticipated, however, is that the huge quantities of cement ordered exceeded the unloading capacity of Nigeria's deep water ports, so that by August 1975, Nigerian ports were so congested with vessels carrying cement that other essential imports could not be unloaded. To deal with this problem, a new Nigerian government issued regulations that required every ship intending to enter a Nigerian port to notify the Nigerian Port Authority two months prior to its departure in order to obtain approval of its arrival date. No ship could thereafter enter a Nigerian port without prior approval. *See* Defendants' Notice of Motion, Exhibits 10, 11. Plaintiff contends that these actions by the defendants constitute an anticipatory breach of the contract.

In mid–September 1975, Central Bank informed its correspondent banks, including Morgan, that it had unilaterally amended all irrevocable letters of credit issued in connection with the cement contracts. On September 30, 1975, Morgan cabled plaintiff to advise that Morgan had been directed to stop demurrage payments against documents unless they had been sent to and certified for payment by Central Bank. Plaintiff was further advised that no payments would be made for those shipments that were not cleared and approved two months prior to their arrival, and plaintiff was invited to meet with Nigeria's Cement Contracts Negotiating Committee. *See id.,* Exhibit 7. There is no doubt that this unilateral amendment of the irrevocable letter of credit violated the provisions of Article 3 of the Uniform Customs and Practice for Documentary Credits. *See id.,* Exhibit 9.

Although not alluded to in plaintiff's complaint, in January 1976, plaintiff's president met with the Cement Contracts Negotiating Committee which was established by the Nigerian Government for the purpose of renegotiating the cement contracts. *See id.,* Exhibit 10, ¶ 5. Plaintiff contends that under conditions that amounted to economic duress, it was forced to enter into a settlement agreement with the Negotiating Committee which reduced the demurrage rate and cancelled the letter of credit and the

balance of the cement contract. *See* Affidavit of Richard L. Trotman, ¶ 7 and Exhibit D (filed April 21, 1980). Plaintiff further contends that, even were the Court to conclude that the settlement agreement is valid, there are still substantial amounts of demurrage payments owed to plaintiff under the settlement. *See* Affidavit of Richard H. Webber, ¶ 4 (filed April 21, 1980).

As a result of the alleged breach of the contract and letter of credit, plaintiff seeks to recover damages for loss of profits on the sale of 200,410 metric tons of Portland Cement in the amount of $1,382,829 and unpaid demurrage in the amount of $2,382,-171.67, as well as reasonable attorney's fees, costs and expenses. The defendants now move to dismiss the complaint on the grounds that this Court lacks subject matter and personal jurisdiction, Fed.R.Civ.P. 12(b)(1), (2), and that the complaint fails to state a claim upon which relief can be granted because of the alleged settlement agreement, Fed.R.Civ.P. 12(b)(6).

## DISCUSSION

■ Plaintiff alleges that this Court has jurisdiction under the Foreign Sovereign Immunities Act of 1976 ["the Immunities Act"], 28 U.S.C. §§ 1330, 1391, 1441, 1601–1611. The Immunities Act provides the district courts with both subject matter and personal jurisdiction over nonjury civil actions against foreign states, in actions in which, pursuant to 28 U.S.C. §§ 1605–1607, foreign states are not immune. *Id.* § 1330. In this respect, the Immunities Act codifies the "restrictive" principle of sovereign immunity which affords immunity to a foreign state's public acts, but not to suits based upon its commercial or private acts. *See* H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 7, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6605 ["the House Report"]. The Act operates as a federal long–arm statute over foreign states and their instrumentalities, and embodies the due process requirements of minimum jurisdictional contacts and adequate notice. *Id.* at 13, *reprinted in* [1976] U.S.Code Cong. &

Admin.News at 6612. The Act, however, "authorize[s] the exercise of less than the complete personal jurisdiction that might constitutionally be afforded American courts under traditional concepts of fairness and due process." *Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1059 (E.D.N.Y. 1979).

> Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.

House Report at 13, *reprinted in* [1976] U.S. Code Cong. & Admin.News at 6612.

Although the allegations of plaintiff's complaint predicate jurisdiction upon the defendants' alleged conduct of commercial activity within the United States through their purported agent, Morgan, plaintiff appears to have abandoned that theory,[2] and now relies on the portion of section 1605(a)(2) that provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> . . . ;

> (2) in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).[3]

The term "commercial activity" is defined by the Immunity Act as follows:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). *See* House Report at 16, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6614–15.

The defendants assert that jurisdiction does not exist under this section because the defendants' acts abroad did not have a "di-

**2.** In *Verlinden B. V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, at 1296–97 (S.D.N.Y.1980), Judge Weinfeld concluded that the establishment of a letter of credit which was advised through Morgan, a New York bank, did not constitute commercial conduct carried on in the United States by the defendants since it did not involve "substantial contact" with the United States as required by 28 U.S.C. § 1603(e).

**3.** Section 1605(a)(2) defines two other "commercial activity" situations in which a foreign state is not entitled to immunity. These are when:

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere

> . . . .

28 U.S.C. § 1605(a)(2).

In its Memorandum of Law at 13–14 (filed April 21, 1980), plaintiff asserts, however, that Nigeria implicitly waived its sovereign immunity by contractually agreeing to arbitrate disputes arising under the contract in France. While there is some support for plaintiff's argument at least with respect to Nigeria, if not the Central Bank, *see* House Report at 7, *reprinted*

*in* [1976] U.S.Code Cong. & Admin.News at 6617; *Ipitrade International, S.A. v. Federal Republic of Nigeria,* 465 F.Supp. 824 (D.D.C. 1978), the Court declines to adopt such reasoning. An agreement that the contract will be governed by the law of another country or submitted to arbitration in another country does not reflect an intention to waive governmental immunity to actions brought against the foreign state in the courts of the United States.

> Plaintiff's view, if adopted, would presage a vast increase in the jurisdiction of federal courts in matters involving sensitive foreign relations: whenever a foreign sovereign had contracted with a private party anywhere in the world, and chose to be governed by the laws or answer in the forum of any country other than its own, it would expose itself to personal liability in the courts of the United States. [The parties to the contract] could scarcely have foreseen this untoward result when they signed the contract; and it is unlikely that Congress could have intended it.

*Verlinden B. V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1302.

rect effect" in the United States as contemplated by the Immunities Act, and because the acts giving rise to plaintiff's claim, the embargo and unilateral amendment of the letter of credit, were acts of state[4] rather than commercial in nature. The Court will address only the first of the defendants' objections since it finds that the "direct effect" requirement of section 1605(a)(2) has not been met in this case.

Even if the defendants' embargo, unilateral amendment of the letter of credit, and alleged breach of the settlement agreement, are commercial activities, the language of the statute still requires that such conduct occurring outside the United States have a "direct effect" in the United States. While the meaning of "direct effect" in this context is less than clear, it does indicate that an examination of the defendants' contacts with the United States in connection with the specific transaction at issue is required. *See East Europe Domestic International Sales Corp. v. Terra*, 467 F.Supp. 383, 388 (S.D.N.Y.), *aff'd mem.*, 610 F.2d 806 (2d Cir. 1979).

The House Report affords some guidance by explaining that the Immunities Act would subject foreign states to the jurisdiction of United States courts when consistent with the principles of section 18, *Restatement (Second) of Foreign Relations Laws of the United States*, (1965), which provides:

Jurisdiction to Prescribe With Respect to Effect Within Territory.

A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either

(a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

(b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.

*Id.*

The House Report suggests that further guidance is provided by the District of Columbia's long–arm statute.[5] House Report at 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6612; *see Harris v. VAO Intourist, Moscow, supra*, 481 F.Supp. at 1063. In *Harris*, Judge Weinstein described the problems that attend any comparison of the Immunities Act with more familiar jurisdictional statutes:

Ascertaining the meaning of "direct effect" and the interpretation of section 1605(a)(2) are difficult because the jurisdictional statutes on which section

---

**4.** *See Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977).

**5.** The long–arm provision of the District of Columbia provides in pertinent part:

(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a *claim for relief from the person's –*

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

(5) having an interest in, using, or possessing real property in the District of Columbia; or

(6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing. 13 D.C.Code § 13–423 (1973).

1605(a)(2) was patterned are, as a comparison of the Act and relevant statutes show, quite different in approach. Although they focus on the contacts of the non–resident, the Virginia, Maryland and District of Columbia statutes, in effect, make distinctions based on traditional classifications of causes of action such as "commercial"–e. g., contract–and "tort"– e. g., negligence, products liability and libel. *See* Note, The Virginia "Long Arm" Statute, 51 Virginia L.Rev. 719, 732 (1965).

In contrast, the Foreign Sovereign Immunities Act is grounded in the history of the State Department's attempts to regularize our courts' treatment of foreign state agencies. The basic distinction is between "governmental" and "commercial" activity. *See* "Tate Letter" to Acting Attorney General Perlman, 26 Dept. State 984 (1954). The "immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)." H.R.Rep.No.94–1487, 94th Cong., 2d Sess. 13, *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, 6605. . . .

. . . . . .

Thus, because of the structure and history of the Immunities Act, it does not reflect the same classifications used by the District of Columbia and similar long–arm statutes. Included in the concept of "commercial activity," as used in the third cause [*sic*] of section 1605(a)(2), are actions which would be characterized as contractual or tortious arising from the "commercial" governmental activities of foreign state–owned entities. The third clause of section 1605(a)(2) encompasses tortious acts outside the United States related to commercial activity (as opposed to governmental activity), having direct effects in the United States.

This interpretation and the legislative history already adverted to would suggest that section 13–423(a)(4) of the District of Columbia statute dealing with

tortious acts or omissions outside the District causing tortious injury within the District provides the strongest analogy to the direct effect clause of section 1605(a)(2) in a factual situation such as the one before us.

*Id.* at 1063–64.

■ As difficult as analogies are in this context, the import of both section 18 and comparisons to the District of Columbia's long–arm statute is that the "direct effect" requirement of section 1605(a)(2) is fulfilled only where there are significant contacts between the transaction underlying the cause of action and the United States.

Thus, in *Harris*, Judge Weinstein concluded that defendants' alleged acts of negligence in causing the death of plaintiff's American decedent in a Moscow hotel fire did not cause a "direct effect" in the United States within the meaning of the third exception to section 1605(a)(2), since the only contact with the forum was an "injurious consequence" of conduct occurring outside the United States. *Id.* at 1064–65; *accord, Upton v. Empire of Iran*, 459 F.Supp. 264 (D.D.C.1978), *aff'd* 607 F.2d 494 (D.C.Cir. 1979).

■ In the present case, all negotiations of the contract and subsequent settlement agreement between the parties were carried on outside the United States and the contract is governed by Nigerian law. Even if the Court assumes that the parties did not enter into a binding settlement agreement which superseded the original cement purchase contract and letter of credit, the only effect in the United States asserted by plaintiff is that the letter of credit was payable in New York to plaintiff, a New York corporation, through a New York correspondent bank of the Central Bank. A letter of credit payable in New York is an accommodation to plaintiff. Its existence does not present a materially different situation from that which exists when a contract calls for payment of the contract price to a New York plaintiff in

New York.[6] In that situation, as in this, the purported injury caused by the breach of contract takes place in the United States "only because the plaintiff is domiciled or doing business here." This, however, "is an insufficient contact for due process purposes." *East Europe Domestic International Sales Corp. v. Terra, supra,* 467 F.Supp. at 390. While the defendants' alleged breach of the contract and letter of credit may have had foreseeable effects in the United States, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980). Furthermore, the House Report clearly indicates, albeit in the context of the "commercial activity carried on in the United States" exception, that Congress intended to bestow jurisdiction only in cases in which there is "a degree of contact *beyond* that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff." House Report at 17, *reprinted in* [1976] U.S.Code Cong. & Admin. News at 6616 (emphasis added).

To the extent that this result is inconsistent with the opinions in *National American Corporation v. Federal Republic of Nigeria,* 448 F.Supp. 622, 639 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir. 1979) and *Verlinden B.*

*V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1299, the Court notes that each case is distinguishable. In *National American Corporation,* jurisdiction was based upon a quasi–in–rem attachment of Nigeria's assets. In *Verlinden,* plaintiff was a Dutch corporation and the locus of injury was outside the United States, which dispelled any possibility of a finding of "direct effect" inside the United States. Therefore, these cases are inapposite here.[7]

Furthermore, plaintiff's reliance upon *Carey v. National Oil Corp.,* 592 F.2d 673 (2d Cir. 1979), is misplaced. In that case, a Bahamian subsidiary of the New York plaintiff had entered into a contract for the delivery of oil with a company owned by the Government of Libya. In an action by the parent company and an assignee of the subsidiary for non–delivery of the oil, the Second Circuit found no "direct effect" in the United States under section 1605(a)(2). Contrary to plaintiff's interpretation, *Carey* does not stand for the proposition that a breach of contract will have a "direct effect" in the United States in all cases where plaintiff is a party to the contract and is domiciled or doing business in the United States. The Second Circuit noted that section 1605(a)(2) embodies the due process standard set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct.

---

6. The letter of credit in this case is an engagement or guarantee undertaken by the Central Bank in Nigeria. The Central Bank guaranteed that amounts due under the cement contract would be paid to plaintiff upon presentation of the appropriate documents at the advising bank, Morgan. Morgan, however, acted only as a correspondent bank, and did not confirm or guarantee the irrevocable letter of credit issued by the Central Bank so that Morgan's contacts with New York have no jurisdictional significance.

In effect, plaintiff alleges a breach of two separate agreements: (1) Nigeria's breach of the cement contract which was occasioned by the embargo and subsequent non–payment of moneys due thereunder, and (2) the Central Bank's breach of the terms of the letter of credit by amending the terms of the irrevocable letter of credit unilaterally. The only contact of either transaction with the United States relates to payments to be made to plaintiff in New York because of the purely fortuitous circumstance that it is a New York corporation.

7. Furthermore, the Court declines to follow former Magistrate Sol Schreiber's recommendation in *East Europe Import–Export, Inc. v. Federal Republic of Nigeria and Central Bank of Nigeria,* 77 Civ. 2809 (LWP) (filed Sept. 19, 1978) and two consolidated Nigerian cement cases which are currently pending before Judge Pierce. *See* Defendants' Notice of Motion, Exhibit 12. In those cases, where the plaintiffs are New York corporations, Judge Pierce confirmed the Magistrate's finding that the alleged breach of a letter of credit payable in New York through a New York correspondent bank of the Central Bank caused a "direct effect" in the United States within the meaning of section 1605(a)(2). The defendants, however, have renewed their sovereign immunity arguments in their post–trial memoranda, and those actions are currently *sub judice.* Since there has been no final judgment in the consolidated actions before Judge Pierce, plaintiff's contention that the Magistrate's finding should collaterally estop the defendants from relitigating the issues decided therein is without merit.

154, 158, 90 L.Ed. 95 (1945), which states that a defendant over whom jurisdiction is sought must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantive justice.'" *Carey v. National Oil Corp., supra,* 592 F.2d at 676. As in *Carey,* there is no indication in the present case that the defendants purposefully availed themselves of the privilege of conducting business in the United States either by injecting products into United States markets, a possible jurisdictional contact noted in *Carey,* or otherwise. *Carey v. National Oil Corp., supra,* 592 F.2d at 677 n.8. *See also Hanson v. Denkla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Since the allegations of plaintiff's complaint do not fulfill the "minimum contacts" requirements of *International Shoe* and its progeny,[8] they cannot reach the level of "direct effect" described in section 1605(a)(2). *Carey v. National Oil Corp., supra,* 592 F.2d at 677.

### CONCLUSION

Accordingly, the defendants' motion to dismiss the complaint for lack of subject matter and personal jurisdiction is granted. Fed.R.Civ.P. 12(b)(1), (2). The Clerk of the Court is directed to prepare and enter a Judgment dismissing the complaint.

SO ORDERED.

---

8. *See Rush v. Savchuk,* 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).